# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2004-CA-00414-SCT

*ARTHUR IRBY AND ILLINOIS CENTRAL RAILROAD COMPANY*

*v.*

*MARY TRAVIS, INDIVIDUALLY, AND AS ADMINISTRATRIX OF THE ESTATE OF MICHAEL TRAVIS, DECEASED, AND ON BEHALF OF ALL WRONGFUL DEATH BENEFICIARIES OF MICHAEL TRAVIS, DECEASED*

| | |
|---|---|
| DATE OF JUDGMENT: | 10/17/2003 |
| TRIAL JUDGE: | HON. JANNIE M. LEWIS |
| COURT FROM WHICH APPEALED: | HOLMES COUNTY CIRCUIT COURT |
| ATTORNEYS FOR APPELLANTS: | GLENN F. BECKHAM |
| | HARRIS FREDERICK POWERS |
| | EDWARD BLACKMON, JR. |
| ATTORNEYS FOR APPELLEES: | DONNA BROWN JACOBS |
| | ANITA K. MODAK-TRURAN |
| | JOHN C. HENEGAN |
| | DENNIS C. SWEET, III |
| | ALYSON LEE BUSTAMANTE |
| NATURE OF THE CASE: | CIVIL - WRONGFUL DEATH |
| DISPOSITION: | ON DIRECT APPEAL:  REVERSED AND REMANDED.  ON CROSS-APPEAL: DISMISSED - 05/25/2006 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**EN BANC.**

**CARLSON, JUSTICE, FOR THE COURT:**

¶1. Illinois Central Railroad Company and Arthur Irby, its locomotive engineer, (collectively Illinois Central) appeals to us from an adverse judgment entered pursuant to a jury verdict awarding damages to the wrongful death beneficiaries of the decedent driver due to a fatal accident at a grade crossing in Holmes County. The plaintiffs have also cross-appealed based on the trial court's failure to conduct an evidentiary hearing on the issue of punitive damages. Finding several reversible errors committed at trial, we reverse the trial court judgment and remand this case to the Circuit Court of Holmes County for a new trial consistent with this opinion. Based on our disposition of Illinois Central's direct appeal, we find it unnecessary to address the issue raised in the plaintiffs' cross-appeal. Accordingly, we dismiss the cross-appeal.

## FACTS AND PROCEEDINGS IN THE TRIAL COURT

¶2. This fatal accident involving a collision between a westbound truck driven by Michael Travis (Michael) and a southbound Illinois Central train occurred on May 16, 1997, at a rural Holmes County grade crossing known as Mileston crossing. Around 10:00 a.m., that day Michael was driving his truck in a westerly direction toward Mileston crossing. At the same time, a farm tractor was approaching the Mileston crossing, traveling in an easterly direction, and approaching the grade crossing from the west. Michael stopped at the tracks, backed up to allow the farm tractor to cross over, and then proceeded on to the tracks, where the truck-train collision occurred.

2

¶3. As a result of Michael's death in this collision, Michael's mother, Mary Travis, individually, and as administratrix of Michael's estate, and on behalf of Michael's wrongful death beneficiaries, filed this wrongful death suit against Illinois Central and certain railroad employees. The plaintiffs asserted, inter alia, that Illinois Central and its locomotive engineer, Arthur Irby, caused the accident by (1) failing to make a proper and timely application of the train brakes; (2) failing to keep a proper and reasonable lookout; (3) failing to properly train the crew on the train; (4) failing to adopt and enforce adequate policies and procedures relating to train operation under similar circumstances; and, (5) failing to properly warn of the dangerous conditions at the Mileston crossing, at a time when Illinois Central and Irby knew, or should have known, that the Mileston crossing was unreasonably dangerous.

¶4. In its subsequently filed answer and affirmative defenses, Illinois Central asserted, inter alia, a federal preemption issue, resulting in this state court action being removed to federal court. In due course, the United States District Court for the Southern District of Mississippi (Jackson Division) entered summary judgment on all issues in favor of Illinois Central. The plaintiffs appealed to the United States Court of Appeals for the Fifth Circuit which found that the federal courts lacked diversity jurisdiction over this case; therefore, the Fifth Circuit vacated the district court judgment and remanded this case with instructions that the case be returned to state court. *Travis v. Irby*, 326 F.3d 644 (5th Cir. 2003).

¶5. Upon remand to the Circuit Court of Holmes County, Illinois Central filed numerous pre-trial motions, including a motion for summary judgment, a motion for change of venue,

and a motion to exclude evidence of two prior accidents at Mileston crossing. The two prior accidents were referred to as the 1990 "Haymer accident," and the 1994 "Hawkins accident." The trial court denied Illinois Central's motion for summary judgment and motion for change of venue; however, the trial court granted Illinois Central's motion in limine to exclude evidence of these two prior accidents. However, on the day of trial, the trial court, evidently sua sponte, reconsidered its prior ruling on the motion in limine and granted the motion to the extent that evidence of the 1994 Hawkins accident would be allowed. The trial of this case resulted in a jury verdict as to liability, assigning percentages of fault as follows: Michael Travis – 25%; Illinois Central – 75%; and, Arthur Irby – 0%. The jury also assessed damages in favor of the plaintiffs in the amount of $5,000,000. The subsequently entered trial court judgment took into account the jury's assessment of damages and fault by entering judgment against Illinois Central and in favor of the plaintiffs in the amount of $3,750,000.

¶6. Upon the trial court's denial of the customary post-trial motions, Illinois Central appealed to this Court on February 27, 2004; and, after briefing was completed by the parties, this case was submitted to us on November 9, 2005, for a decision. Illinois Central assigns numerous issues concerning perceived trial court error in (1) denying Illinois Central's motions for instructions D-1, D-2, and D-3; (2) allowing testimony regarding other accidents and other alleged near accidents at the Mileston crossing, and in failing to grant Illinois Central's motions for mistrial after (a) the plaintiffs' presentation of evidence regarding the Haymer accident; (b) Thelma Washington's testimony of other accidents at the Mileston

4

crossing; (c) Annie Marie Sago's testimony regarding other accidents at the Mileston crossing; and, (d) R. C. Howard's testimony regarding "near accidents" he experienced at the Mileston crossing; (3) denying Illinois Central's *Daubert* motion to exclude the testimony of Dr. David Lipscomb, the plaintiffs' audiologist; (4) overruling Illinois Central's objection to Dr. Lipscomb's testimony regarding the manufacturer's specifications for the horn on the subject locomotive; (5) denying Illinois Central's motion in limine seeking to preclude the plaintiffs' expert, Jim Scott, from testifying due to his illegal trespass onto Illinois Central's property, and in denying Illinois Central's *Daubert* motions regarding Scott's testimony; (6) allowing Scott to testify regarding a video which he made of the Mileston crossing on July 28, 1997; (7) allowing the plaintiffs to conduct a redirect examination of Scott as to the speed of the subject locomotive; (8) denying Illinois Central's objections to portions of the depositions of Illinois Central's train crew (A. C. Isaac and Arthur Irby) regarding the training they received from Illinois Central; (9) denying Illinois Central's motion in limine and *Daubert* motion to exclude the expert witness testimony of Dr. Kenneth Wayne Heathington; (10) allowing Dr. Heathington to testify that the City of Tchula and Holmes County cannot install safety devices at the Mileston crossing; (11) allowing Dr. Heathington to testify that the conditions at the Mileston crossing on September 14, 1994, (the date of the Hawkins accident) were substantially similar to the conditions existing on the date of Michael's accident; (12) allowing Dr. Heathington to testify that other railroads voluntarily place active warning devices at their crossings; (13) denying Illinois Central's objections to

5

the plaintiffs' jury instructions, and allowing Instructions P-2, P-3, P-4, P-9, and P-12 to be given either in whole or as amended; (14) denying or amending Instructions D-1, D-2, D-3, D-6, D-7, D-8, D-8A, and D-9, as proposed by Illinois Central; (15) allowing portions of Steven Edwards's deposition to be presented to the jury during Dr. Heathington's testimony; (16) allowing the plaintiffs to introduce, via the testimony of Dr. Heathington, a plan view of the Mileston crossing depicting irrelevant quadrants of the subject intersection; (17) allowing Dr. Heathington to testify regarding photographs and what Michael saw on the date of the accident, and whether these photographs accurately reflected Michael's view of the crossing on the date of the accident; (18) admitting into evidence and allowing testimony regarding the revised report of the plaintiffs' economist, Dr. G. Richard Thompson; (19) allowing the plaintiffs to present testimony regarding meetings which allegedly took place in the Mileston community before and after Michael's accident; (20) denying Illinois Central's motion for mistrial when the plaintiffs' counsel elicited testimony from Illinois Central's risk manager, Kenneth Robinson, concerning a 1991 survey of Holmes County railroad crossings; (21) denying Illinois Central's "for cause" jury challenges to the potential jurors who admitted to driving across the Mileston crossing in the previous year; (22) failing to dismiss for cause the potential jurors in the venire who admitted to taking medication which made them drowsy; (23) denying Illinois Central's *Batson* challenges to the plaintiffs' peremptory jury strikes; (24) allowing the plaintiffs to include in the record as an offer of proof the letter dated December 3, 1990, from Thomas Zeinz to Joe Clark; (25) denying

6

Illinois Central's motions for change of venue; (26) excluding portions of the federal court record from the record in this cause; and, (27) failing to grant certain post-trial motions because the jury's assessment of fault and the amount of damages were against the overwhelming weight of the evidence.

¶7. We find that the trial court appropriately denied Illinois Central's motion for a judgment notwithstanding the verdict, however, on the other hand, we find that several reversible errors occurred during the course of the trial which required the trial court to grant Illinois Central's motion for a new trial. Because the trial court failed to grant Illinois Central's motion for a new trial, we reverse the trial court judgment and remand this case to the Holmes County Circuit Court for a new trial consistent with this opinion.

## DISCUSSION

¶8. While we have already set out Illinois Central's numerous assignments of error, we will restate and reorder certain issues for the sake of clarity. Since we are remanding this case for a new trial, we will discuss only certain issues which we find to mandate a remand, and which we find will aid the trial court and the attorneys upon the retrial of this case.

### I. WHETHER THE TRIAL COURT ERRED IN DENYING ILLINOIS CENTRAL'S MOTION FOR A JUDGMENT NOTWITHSTANDING THE VERDICT.

¶9. In today's case, Illinois Central, in being dissatisfied with the trial court's entry of a judgment against it, both as to liability and damages, quite understandably filed a post-trial motion for a judgment notwithstanding the verdict, asserting that the evidence before the trial

court was legally insufficient to undergird a verdict for the plaintiffs. Our cases are legion where we have been called upon to consider the issue of whether the trial court appropriately denied a jnov motion. We recently stated:

> The standard of review in considering a trial court's denial of a motion for judgment notwithstanding the verdict is de novo. ***Wilson v. Gen. Motors Acceptance Corp.****,* 883 So.2d 56, 64 (Miss. 2004). The trial court must view the evidence in the light most favorable to the non-moving party and look only to the sufficiency, and not the weight, of that evidence. ***Id.*** at 63. Here, when considering all of the evidence in the light most favorable to [the non-moving party], if such evidence were insufficient to uphold the verdict, the trial court must grant the motion for a j.n.o.v. [The moving parties] claim through this motion that the evidence, when taken as a whole, and when viewed in the light most favorable to [the non-moving party], will leave no reasonable doubt in the jury's minds that [the non-moving party] was negligent. They claim that the verdict was against both the weight and the sufficiency of the evidence. That weight and sufficiency of the evidence are not synonymous bears repeating both here and in the final issue below. Our recent opinion in ***Bush v. State****,* 895 So.2d 836, 843 (Miss. 2005), discussed sufficiency versus weight of the evidence. When determining whether the evidence was *sufficient,* the critical inquiry is whether the evidence is of such quality that reasonable and fairminded jurors in the exercise of fair and impartial judgment might reach different conclusions. ***Jesco, Inc. v. Whitehead***, 451 So.2d 706, 713-14 (Miss. 1984) (Robertson, J., specially concurring). When looking at all of the evidence, even that which [the moving parties] argued was objectionable, we cannot say that the jury could have only properly found for [the moving parties]. Conflicting evidence exists which could cause fairminded jurors to reach different conclusions and thus, granting this motion would have been improper.

***Poole ex rel. Poole v. Avara***, 908 So.2d 716, 726 (Miss. 2005).

¶10. In applying this standard of review, we return now to the relevant facts of today's case in addressing the jnov issue. A brief description of the Mileston crossing is helpful. The railroad tracks run generally north and south. Highway 49 runs generally parallel with the

8

tracks, and in the area of the Mileston crossing, Highway 49 is located a mere seventy-five feet west of the tracks. A relatively short distance north of the Mileston crossing, the tracks curve. A southbound train approaching Mileston crossing from the north would curve to the right. If a southbound train is approaching this curve as the driver of a westbound vehicle is approaching Mileston crossing from the east, that driver, if the driver is looking, should be able to notice the headlights of the train as it comes into the curve. On the date of the accident, Michael was driving his truck in a westerly direction as he approached Mileston crossing. At the same time, a tractor with an oversized farm implement was approaching Mileston crossing traveling in an easterly direction. Throughout the trial, the west side of Mileston crossing was referred to as the "highway side" and the east side of Mileston crossing was referred to as the "field side." Certain "day-of-the-accident" color photographs introduced at the trial revealed that the driver of a westbound vehicle approaching Mileston crossing from the field side should have a clear, unobstructed view of a southbound train as far north of the crossing as the curve. Once Michael reached the crossing, he had to back up his truck in order to allow the eastbound tractor to cross the tracks. Once the tractor approaching from the highway side had cleared the tracks on the field side (Michael's side), Michael then slowly drove his truck up on the tracks where the southbound train collided with his truck. We admittedly find questionable certain trial testimony indicating that once the tractor was on the field side, it would have blocked Michael's view of the southbound train. Once the tractor was on the field side of the tracks and passing Michael's truck, the

9

tractor would have been on the south side of Michael's truck. The southbound train was approaching Mileston crossing from the north side of Michael's truck. If Michael is looking to his right, he should see, not the tractor, but instead the southbound train traveling fifty-two miles per hour. It also appears to be indisputable that, as the southbound train was approaching Mileston crossing, the train's horn was blowing. Additionally, there is no dispute about the fact that there were no crossing gates, flashing lights and ringing bells at the Mileston crossing.

¶11. However, based on conflicting testimony as to the existing vegetation at the Mileston crossing on the date of the accident, and the actions of Michael and the crew members on the train, we are constrained to find, as a matter of well-established law, that there exists in the record evidence of such quality and weight that reasonable and fair-minded jurors, in the exercise of impartial judgment, might have reached different conclusions as to the appropriate verdict. *Id.* Thus, we are unable to find that the trial court committed error in denying Illinois Central's motion for a judgment notwithstanding the verdict; therefore this issue is without merit.

## II. WHETHER THE TRIAL COURT ERRED IN ADMITTING EVIDENCE OF PRIOR ACCIDENTS AT THE MILESTON CROSSING.

¶12. At a pretrial conference, the trial judge granted a motion in limine filed by Illinois Central, to the extent that evidence of two prior accidents at Mileston crossing would not be admissible. The two prior accidents at issue were referred to as the "Hawkins accident,"

10

which occurred in 1994, and the "Haymer accident," which occurred in 1990. However, on the day of trial, the trial judge, evidently sua sponte, reversed herself to the extent that she reconsidered and decided to allow evidence of the 1994 Hawkins accident to be considered by the jury. Although the trial court offered little by way of an on-the-record analysis to support its decision to allow evidence of the Hawkins accident, we do know from the record that the trial judge relied on this Court's decision in *Illinois Cent. R. Co. v. Williams*, 242 Miss. 586, 135 So.2d 831 (1961), to undergird her decision to allow evidence of the Hawkins accident. The gist of the trial judge's reconsidered sua sponte ruling was that based on *Williams*, the Hawkins accident was "substantially similar" to Michael's case.

¶13.    We are fortunate to have a detailed account of the Hawkins accident since the Hawkins case was appealed to this Court. *Illinois Cent. R. Co. v. Hawkins*, 830 So.2d 1162 (Miss. 2002). In *Hawkins*, we generally described the Mileston crossing as it existed on September 14, 1994, the date of the "Hawkins accident."

> The collision that is the subject of this appeal occurred at the Mileston crossing in Holmes County. The railroad tracks there run north and south parallel to U.S. Highway 49E. A public gravel road intersects Highway 49 on the east side, crosses the track, then forks into two directions. The Mileston crossing is marked by one railroad crossbuck sign on each side.
>
> On September 14, 1994, Cox was visiting her mother, Bertha Winters. Winters's home is approximately 125 feet from the Mileston crossing. Testimony at trial showed that Cox backed out of her mother's driveway sometime around 4:00 P.M. and headed west toward the crossing.

830 So.2d at 1168. Also, a review of the facts in *Hawkins* reveals that while the vehicle involved in the train collision was traveling west across the Mileston crossing (the same

11

direction as Michael's vehicle), the northbound train was coming from the south, to the left of the vehicle. ("...that [the decedent] was not even looking at the train, but that she was looking north and appeared to be pointing at a passenger in the car." *Id.* at 1169). The record in today's case also confirms that the train in the Hawkins accident was northbound, and not southbound, as was the train in the case sub judice. Additionally, the train in *Hawkins* suddenly appeared from an existing tree line on the east side of the tracks and south of the Mileston crossing. *Id.* Further, the plaintiffs' own witness, Alvin P. Haymer, testified that between the time of the 1994 Hawkins accident and the time of Michael's accident in 1997, trees had been removed from the Mileston crossing area all the way north to the curve, and that the "[o]nly thing we got now is the growing up vegetation; that's what we got."

¶14.    Turning now to the trial court's reliance on *Williams*, we will discuss this Court's decision in *Williams* as it relates to the relevant facts of today's case. It is interesting to note that while the accident in *Williams* occurred at a railroad crossing on Northside Drive in the City of Jackson, the case was tried in the Choctaw County Chancery Court before a chancellor, sitting, without a jury, with jurisdiction having been obtained by way of a nonresident attachment. The accident occurred at 1:00 a.m., and involved a decedent driver who was not familiar with the Northside Drive railroad crossing, and involved, inter alia, the issue of whether the decedent driver could have seen the train which was already occupying the crossing at the time of the collision (the decedent driver collided with the forty-seventh car of a ninety-one car freight train). This Court discussed the poor lighting at the railroad

12

crossing, such as the lack of adequate City of Jackson street lights; the inability of the decedent driver to see the headlights of another car on the other side of the crossing due to the angle of the grade crossing; and, the bright lights of a generating plant on the opposite side of the tracks from the decedent driver, which lights were reflecting in the nighttime sky, thus making it difficult for the decedent driver to see the unilluminated box cars already occupying the grade crossing. *Williams*, 242 Miss. at 596-98, 135 So.2d at 834-35.

¶15.    While we can unhesitatingly state that *Williams* stands for the proposition that prior-accident evidence may be properly admitted for the purpose of showing that the railroad had notice of the existence of a dangerous condition at the subject crossing, that is not all *Williams* has to say on this subject.  This Court, in *Williams*, stated:

> The trial court admitted into evidence, over objections of defendants, answers to complainants' interrogatories concerning two other accidents which happened at the Northside Drive crossing with the Y. & M. V. line, within less than nine months before Williams was killed. On January 1, 1959, a locomotive struck a car, and four people were killed. In the second accident on March 19, 1959, the automobile struck the side of a locomotive, and four young people were injured.  Appellant contends that the facts and circumstances of these accidents were entirely different from those in the instant case, so the evidence should have been excluded; and that prior occurrences must involve substantially similar facts having a bearing on the litigated case.
>
> This evidence was admitted for the purpose of showing notice to the railroad of the unusual danger and the existence of a dangerous condition. *S. H. Kress & Co. v. Markline*, 117 Miss. 37, 77 So. 858 (1917); Anno., 128 A.L.R. 595 (1940). 20 Am.Jur., Evidence, Sec. 304, summarizes the general rule as follows: '* * * evidence of *other similar accidents* or injuries at or near the same place or by the use of the same appliance suffered by persons other than the plaintiff and in other and different times, not too remote in point of time from the particular occurrence, is admissible. *Evidence of prior similar*

13

*accidents, when admissible,* is generally admissible for the following purposes only: (1) To show the existence of a defective or dangerous condition or appliance and the dangerous character of the place of injury or of the machine or the appliance, and (2) to show the defendant's notice or knowledge thereof.'

242 Miss. at 605-06, 135 So.2d at 839 (emphasis added).

¶16.    Illinois Central asserts in the case sub judice that the trial court improperly relied on *Williams* in deciding to admit evidence of the Hawkins accident because *Williams* was decided under the "occupied crossing doctrine," meaning that the train entirely occupied the crossing at the time of the subject accident, and that vegetation did not factor into our decision in *Williams*. The plaintiffs counter these arguments by stating that as in this case, the railroad in *Williams* argued that the facts of two other accidents at the same crossings were entirely different, that the prior occurrences must involve "substantially" similar facts, and thus the evidence of the prior accidents should have been excluded; however, the plaintiffs conclude that, notwithstanding this argument by the railroad in *Williams*, this Court allowed the evidence for the purpose of showing notice to the railroad of an unusual danger.

¶17.    We read the plaintiffs' argument to be that, notwithstanding the fact that the "prior-accident" evidence in *Williams* involved prior accidents which "were entirely different," this Court held that the evidence was still admissible for the purpose of showing that the railroad had prior notice of an unusually dangerous crossing. However, we disagree that *Williams* stands for this proposition. First of all, the Court, in *Williams*, did not provide the details concerning the two prior accidents. All we know is that this Court, in *Williams*, merely stated that the *railroad contended* that the facts and circumstances of the prior accidents were

14

"entirely different" from the facts of the accident in *Williams*. *Id.* at 605, 839. A fair reading of *Williams* cannot lead one to conclude that this Court found that the two prior accidents in question were factually dissimilar from the facts of the accident under discussion. In fact, a close reading of *Williams* undergirds our long-held position that prior-accident evidence is admissible to show the railroad's knowledge of a dangerous condition at the crossing, only when the prior-accident evidence involves accidents which are "similar." *Id.* Also, we have to remember that the "city street" railroad crossing in *Williams*, which did not involve a vegetation issue, had more permanent conditions than does the Mileston crossing, which has vegetation changing due to the seasons, and due to the evidence of tree-cutting by the railroad between the 1994 Hawkins accident and the 1997 accident which is the subject of today's appeal.

¶18.    Even accepting as true Alvin P. Haymer's opinion that in 1997, the conditions of the Mileston crossing were "worser" than they were in 1994, a review of the record reveals the fact that the conditions of the Mileston crossing on May 16, 1997, at the time of Michael's accident, were substantially different than the conditions of the crossing on September 14, 1994, at the time of the Hawkins accident. Stated differently, the substantially dissimilar facts in these two accidents are, inter alia: (1) the Hawkins accident involved a northbound train suddenly appearing from an existing tree line on the east side of the tracks and south of the Mileston crossing, while today's accident involved a clearly visible southbound train coming out of the curve north of the Mileston crossing; (2) after the 1994 Hawkins accident, and

15

prior to the occurrence of Michael's accident, there had been extensive tree-cutting from the Mileston crossing all the way to the curve north of the crossing; (3) the decedent driver in *Hawkins* drove up on the tracks at the crossing without stopping, while Michael drove up to the tracks, stopped, backed up and stopped to allow the farm tractor to cross the tracks, and then started again, and drove up on the crossing; (4) the Hawkins accident occurred in September, while Michael's accident occurred in May, meaning, there would most likely have been a difference in the color and extent of the vegetation; and, (5) the decedent driver in *Hawkins* would have been looking into the sun at 4:00 p.m. on the day of her accident, whereas Michael would have had the sun to his back as he approached the Mileston crossing at 10:00 a.m. on the day of his accident. These are but a few of the substantial differences which we find between the Hawkins accident and the accident which is the subject of today's appeal.

¶19. In *Mitcham v. Illinois Cent. Gulf R. Co.*, 515 So.2d 852 (Miss. 1987), this Court stated that "[w]here evidence of other accidents or injuries is used to show the risk that a defendant's conduct has created, the requirement of substantial similarity is applied strictly." *Id.* at 855 (citing *McCormick on Evidence*, § 200 (3rd ed. 1984)). In *Mitcham*, which, like today's case, was a "vegetation" case, this Court stated:

> In the case sub judice, it must be noted that there is no record of the hearing on the motion in limine, but it can be gathered from the trial record that the lower court found that this situation lacked the requisite permanence of conditions, in that the conditions of the crossing that would have been put into issue, the height of vegetation on ICGRR's right-of-way, change with the seasons.

16

***Id.*** at 856. Even though this Court acknowledged that there was very little in the record to aid it in comparing the similarity or dissimilarity of the three prior accidents with the train accident under discussion, we stated:

> [W]e must assume that there was never a substantial showing of similarity of conditions so as to satisfy the lower court. Under these circumstances the evidence was not admissible to show either the existence of a dangerous condition or knowledge of hazardous circumstances.

***Id.*** (citing ***Parmes v. Illinois Cent. Gulf R.R.***, 440 So.2d 261, 265 (Miss. 1983)).

¶20.    In ***Illinois Cent. Gulf R.R. v. Ishee***, 317 So. 2d 923, 925-26 (Miss. 1975), this Court held an experiment that depicted conditions of a train accident was inadmissible where the issue involved the line of sight. At the time of the accident, a dense amount of weeds was growing along the railroad's right of way. ***Id***. at 925. However, at the time of the experiment, the right of way had been cleared of the weeds. ***Id***. We held the experiment was inadmissible, stating "the presence of weeds substantially in the amount that existed at the time of the accident was of vital importance to the experiment for it to have had any probative value whatsoever." ***Id***. at 926. Although the issue in ***Ishee*** involved a reconstruction of the conditions at the time of the accident, we find this case to be instructive.

¶21.    Thus, in the case at bar, as to the issue of a motorist being able to see an oncoming train, trees and vegetation are quite different. Moreover, the fact that the train was traveling in a different direction from the train in Hawkins weakens the plaintiffs' claim that the conditions of the Hawkins accident were substantially similar as to those in the case sub judice. Because the Hawkins accident was not substantially similar to the case sub judice,

17

the trial judge erred in allowing such evidence, and as such, the evidence "result[ed] in harm and prejudice or adversely affect[ed] a substantial right of [the defendant]." *Miss. Dep't of Transp. v. Cargile*, 847 So. 2d 258, 263 (Miss. 2003).

¶22. In reliance on *Mitcham*, we unquestionably find that the substantial differences between the facts and circumstances of the 1994 Hawkins accident and the 1997 accident involving Michael, caused evidence of the Hawkins accident, and its surrounding facts and circumstances, to be inadmissible. Because the trial court allowed evidence of the Hawkins accident in today's case, it committed error which we find to be reversible.

¶23. We again considered prior-accident evidence in our recent decision in *Richardson v. Norfolk Southern Ry.*, 923 So.2d 1002 (Miss. 2006). *Richardson* involved "other accident evidence" by way of a prior accident which occurred at the same crossing over thirteen years prior to the accident under discussion, and a "yet-to-happen 2003 accident" which occurred more than three and one-half years after the accident under discussion. *Richardson*, *Id.* at 1010. In *Richardson*, we found this prior accident evidence to be inadmissible, and affirmed the trial court's exclusion of this evidence. *Id.* One could argue that in *Richardson*, we *did not state* that evidence of an accident which happened three years *prior* to the accident under discussion could not be used to prove that a railroad was on notice that a dangerous condition existed." However, what we unquestionably *did state* in *Richardson* is the following:

> The rule has been long established in Mississippi that evidence of prior accidents may be introduced at trial to show two things: (1) the existence of a dangerous condition; and, (2) the defendant's notice or knowledge of such dangerous condition. *Yoste v. Wal-Mart Stores, Inc.,* 822 So.2d 935, 936

18

(Miss. 2002); *see also* Miss. R. Evid. 404(b). However, evidence of prior accidents will only be admitted upon a showing of substantial similarity of conditions. *Yoste,* 822 So.2d at 936. This Court has made it clear that when evidence of other accidents is introduced, it may not be too remote in time from the accident in issue. *Illinois Cent. R.R. v. Williams,* 242 Miss. 586, 135 So.2d 831, 839 (1961). We found in *Williams* that "other accident" evidence occurring within nine months of the subject of the dispute was not too remote in time for the evidence to be inadmissible. *Id.* This Court has also found "other accident" evidence occurring over time periods less than one year close enough in time to be admissible. *Barrett v. Parker,* 757 So.2d 182, 188-89 (Miss. 2000) (one year); *S.H. Kress & Co. v. Markline,* 117 Miss. 37, 77 So. 858, 864 (1918) (two years).

923 So.2d at 1009-10.

¶24.   As noted in *Richardson*, we cited our 2000 decision in *Barrett*, which involved, not a train-vehicle collision, but instead, a suit against a cattle owner by the driver of a motor vehicle which struck one of the cows which had wandered on to a county road in Lamar County.  At trial, the plaintiff attempted to offer evidence of other incidents where the same cattle owner's cows had escaped from a field and wandered on to the county road.  The trial court allowed limited evidence of these other incidents as long as there was proof that these other incidents had occurred no more than one year prior to the car-cow accident in question. On this point we stated:

> Rather than absolutely prohibiting all evidence of incidents involving Parker's cattle, the trial court allowed Barrett to introduce this type of evidence as long as these alleged events occurred no more than one (1) year prior to Barrett's accident. This one-year limitation is reasonable under the holding in *Massey*, as it is certainly possible that the circumstances surrounding any alleged incidents occurring more than one (1) year prior to Barrett's accident may not have existed when Barrett's accident happened.

19

757 So.2d at 188-89. In *Barrett*, we cited to *Hartford Insurance Group v. Massey*, 216 So.2d 415 (Miss. 1968). *Massey* also involved a car-cow accident, this time on a highway. In *Massey*, the plaintiff also attempted to offer evidence of other prior accidents involving cows in the same location. In addressing this issue, this Court stated:

> The evidence of the commission of similar acts or the occurrence of prior accidents is admissible mainly where there is some special connection which tends to show plan, notice or knowledge of danger, or a dangerous condition. 29 Am.Jur.2d Evidence s 298 (1967). Mississippi has long followed the rule of admitting evidence of prior acts or accidents for the purpose of showing a dangerous condition and notice thereof, but this evidence has been admitted only in cases where other proof of negligence is present. *Gulf Hills Dude Ranch, Inc. v. Brinson*, 191 So.2d 856 (Miss. 1966); *Illinois Cent. R.R. Co. v. Williams*, 242 Miss. 586, 135 So.2d 831 (1961); and *S. H. Kress & Co. v. Markline*, 117 Miss. 37, 77 So. 858 (1918).

> In general, the admissibility is limited to conditions of permanency and the evidence must show that former accidents happened under substantially the same circumstances as those existing at the time of the accident. 29 Am.Jur.2d Evidence s 298 (1967).

216 So. 2d at 417.

¶25. In the end, in "strictly applying" the proof-of-substantial-similarity requirement for prior-accident evidence, as prescribed by *Mitcham*, and for all the reasons discussed, we find that the trial court abused its discretion in allowing evidence of the 1994 Hawkins accident, and that this error rises to the level of being reversible, especially when considering the questionable extent of liability/fault on the part of Illinois Central, as found by the jury, and certain other trial court errors which we will discuss, infra.

¶26. In discussing the Hawkins accident, Annie Marie Sago testified as to other "accidents" (plural), to which Illinois Central objected, and the trial court sustained the objection, but denied the motion for a mistrial, because it was no more than a "slip of the tongue." The plaintiff argues Illinois Central suffered no prejudice as a result of this testimony. However, we disagree, especially when this evidence on non-similar accidents is coupled with Thelma Washington's testimony. The plaintiffs' attorney questioned Washington about an area meeting to try to get additional signalization at the Mileston crossing. Washington testified, in part, as follows:

> Q: Tell the ladies and gentlemen of the jury what this meeting was concerning.
> A: It was concerning – talking about the meeting?
> Q: Before Michael Travis' death.
> A: It was concerning getting some lights up at that crossing.
> Q: And why was it concerning – what was the reason that was being discussed?
> A: Because there were so many accidents.

Illinois Central's counsel immediately objected and moved for a mistrial. The trial court overruled the objection and denied the motion for a mistrial. Again, based on the totality of the record before us, we find this testimony to be highly prejudicial and reversible error.

¶27. Finally, we consider the testimony of R. C. Howard, who testified at trial, via deposition, as to his experiences regarding "near-accidents" at the Mileston crossing. Over Illinois Central's objection, the trial court allowed Howard's deposition testimony that he was almost hit by a train at the Mileston crossing on two different occasions prior to Michael's accident. As to Howard's experiences, there was no evidence presented to the

21

jury as to possible fault on the part of Howard which placed him in the position of a "near-accident." In *Sawyer v. Illinois Cent. Gulf R.*, 606 So.2d 1069 (Miss. 1992), we found that the trial court did not commit error in excluding "near-accident" evidence. En route to this finding, we stated:

> We have no doubt there are cases (sic) where evidence of near accidents may be admissible for the purpose of showing the dangerous character of a place and to show notice thereof to the person in control. Rules 401, 402, Miss.R.Ev.; *S.H. Cress & Co. v. Markline*, 117 Miss. 37, 77 So. 858, 862 (1918); *Missouri-Kansas-Texas Railroad Co. v. McFerrin*, 279 S.W.2d 410 (Tex.Civ.App.1955). On the other hand, the fact of a near miss, and, for that matter, a hit, in and of itself proves very little and indeed may be quite prejudicial. *See* Rule 403, Miss. R. Ev. The fact that an accident almost occurs at a particular location does not necessarily imply any fault or neglect on the part of the person in control of the premises. The point has an important context. *Railroad crossings are dangerous places*, and they are no less so that we encounter the danger with less frequency than in other days. *Wilner v. Mississippi Export Railroad Co.*, 546 So.2d at 681. Accepting these realities, our statute law mandates a motorist "look and listen as he approaches a crossing." *Mitcham v. Illinois Central Gulf Railroad Co.*, 515 So.2d at 855; *Slay v. Illinois Central Gulf Railroad Co.*, 511 So.2d at 880; *Dale v. Bridges*, 507 So.2d 375, 377 (Miss.1987). *When trains approach sounding their signals, roadway travelers must give heed.* Miss.Code Ann. § 77-9-249 (1972). Accordingly, to be admissible, prior-accident-and certainly near-miss-testimony-must be carefully qualified. *Mitcham*, 515 So.2d at 855-56; *Parmes v. Illinois Central Gulf Railroad*, 440 So.2d 261, 265 (Miss. 1983).

606 So.2d at 1075-76 (emphasis added). There is absolutely no question that Howard's "near-miss" testimony was not "carefully qualified" by the trial court, consistent with *Sawyer*, prior to determining admissibility. The admission of this testimony was error.

¶28.    In the end, we have discussed but mere examples of only *some* of the errors which were committed regarding the trial court admission of prior-accident and "near-accident"

evidence. Because of the cumulative effect of these various errors in allowing "other-accident" evidence, we are compelled to find that a new trial is required; however, we will proceed to a discussion of certain other issues.

### III. WHETHER THE TRIAL COURT ERRED IN ADMITTING EVIDENCE OF THE VOLUNTARY ACTIONS OF OTHER RAILROAD COMPANIES CONCERNING THE PLACEMENT OF ACTIVE WARNING DEVICES AT THEIR GRADE CROSSINGS.

¶29. Getting right to the point on this issue, we find that it was also highly prejudicial, and reversible error, to allow Dr. Kenneth Wayne Heathington to testify that other railroad companies had voluntarily placed active warning devices at their grade crossings, and that Illinois Central could have upgraded the Mileston crossing by installing gates and flashing lights if it had only chosen to do so. The effect of this and other similar evidence is that it was drilled into the collective head of the jury that Michael would be alive today if Illinois Central had only installed gates and flashing lights at the Mileston crossing. That is wholly unfair, because while it is true that fatalities at railroad grade crossings would become virtually nonexistent if every railroad crossing in the United States had gates, flashing lights and ringing bells, such a requirement would be unquestionably impractical.

### IV. WHETHER THE TRIAL COURT ERRED IN GRANTING CERTAIN JURY INSTRUCTIONS SUBMITTED BY THE PLAINTIFFS.

¶30. The trial court granted Jury Instruction Number 8 (submitted by the plaintiffs as Jury Instruction P-4). This instruction stated:

23

> The Court instructs the jury that if you find from a preponderance of the evidence that, prior to May 16, 1997, Illinois Central Railroad failed to exercise reasonable care in erecting adequate warning devices at the Mileston Crossing so that the crossing was not reasonably safe for motorists like Michael Travis, or that the railroad should have placed more or different warnings than it did, and if you further find by a preponderance of the evidence that such failure, if any, by Illinois Central Railroad proximately caused or contributed to the injuries to and death of Michael Travis, then you must return a verdict for the Plaintiff Mary Travis, as Administratrix of Michael Travis's estate and on behalf of Michael Travis's Wrongful Death Beneficiaries.

We agree with Illinois Central that this jury instruction was impermissibly vague and confusing in using terms and phrases such as "adequate warning devices," and "that the railroad should have placed more or different warnings than it did," without any guidance to the jury as to the use of these terms. *See **Clark v. Illinois Cent. R.R.***, 872 So.2d 773, 777 (Miss. Ct. App. 2004). After all, we have stated: "The test of whether a railroad crossing is unusually dangerous has been said to be the ability of the traveler to observe the approach of a train from the direction in which it is coming." ***Illinois Cent. R. v. McDaniel***, 246 Miss. 600, 615, 151 So.2d 805, 811 (1963) (citing 74 C. J. S. *Railroads* § 711, page 1306).

¶31. The trial court's granting of this instruction was error, and when combined with the other errors, such as "other-accident" evidence and Dr. Heathington's improper testimony about the gates and flashing lights, the giving of this jury instruction certainly rises to the level of reversible error. Again, improper evidence had already planted the seed in the jury's mind that Michael would be alive today if Illinois Central had only spent a little money and placed gates, flashing lights, and ringing bells at the Mileston crossing; and, the giving of this

24

jury instruction only etched in stone that all the jury had to do in order to find for the plaintiffs was to find that Illinois Central failed to erect "adequate warning devices" and that Illinois Central "should have placed more or different warnings than it did."

¶32. Additionally, we cannot overlook the fact that the record unquestionably reveals that prior to the date of the accident which claimed his life, Michael had traveled across the railroad tracks at the Mileston crossing on numerous occasions. In fact, there is evidence that Michael crossed the railroad tracks at the Mileston crossing on an average of 3-4 times per week. Thus, Michael was unquestionably familiar with the crossbuck signs which were present at the Mileston crossing. In other words, on this clear day on May 16, 1997, Michael knew that he was approaching the railroad tracks. Somewhere along the way during the trial of this case, the jury's attention most assuredly had been diverted away from such critical issues as the condition of the vegetation at the crossing, Michael's actions before the accident, and what Michael could have seen if he were looking to his right as he approached the Mileston crossing from the field side of the crossing.

¶33. For these reasons, we find that the granting of the plaintiffs' jury instruction number P-4 was reversible error, especially in light of the highly prejudicial evidence which the trial court erroneously allowed to be considered by the jury.

¶34. Because of our disposition of the issues thus far discussed, we deem it unnecessary to discuss the remaining issues raised by Illinois Central on direct appeal; therefore, we now proceed to briefly mention the issue raised by the plaintiffs on cross-appeal.

25

## V. WHETHER THE TRIAL COURT ERRED IN DENYING THE PLAINTIFFS' REQUEST FOR A HEARING ON THE ISSUE OF PUNITIVE DAMAGES.

¶35. After the jury returned its verdict awarding compensatory damages, the plaintiffs requested that the trial court proceed to conduct an evidentiary hearing on the issue of punitive damages; however, the trial court denied the plaintiffs' request. Based on our disposition of the issues raised by Illinois Central in its direct appeal, we find it unnecessary to address the this issue raised via the plaintiffs' cross-appeal. Accordingly, we dismiss the cross-appeal as moot.

## CONCLUSION

¶36. Every party to civil litigation – whether a private citizen, rich or poor, or a corporation which has a multi-billion dollar bottom line in a financial statement – is entitled to fair treatment in the courts of this state. We unquestionably conclude that the record in today's case is fraught with inadmissible evidence which could only have impermissibly aroused the emotions of the jury so as to divert the jury's attention away from focusing on the properly admitted evidence in order to calmly and rationally decide first the issue of liability, and, if necessary, then the issue of damages.

¶37. While we find that the trial court properly denied Illinois Central's motion for a judgment notwithstanding the verdict, we find that the trial court erred in denying Illinois Central's motion for a new trial. Additionally, because of our grant of a new trial, it becomes

26

unnecessary to address the issue of the trial court's denial of a hearing on punitive damages, as raised on cross-appeal by the plaintiffs.

¶38.   Accordingly, the trial court judgment entered against the Illinois Central Railroad Company and in favor of Mary Travis, Individually, and as Administratrix of the Estate of Michael Davis, Deceased, and on behalf of all wrongful death beneficiaries of Michael Travis, Deceased, is reversed, and this case is remanded to the Circuit Court of Holmes County for a new trial on all issues, consistent with this opinion.  Plaintiffs' cross-appeal is dismissed as moot.

¶39.   **ON DIRECT APPEAL: REVERSED AND REMANDED.   ON CROSS-APPEAL: DISMISSED.**

**SMITH, C.J., WALLER AND COBB, P.JJ., EASLEY AND DICKINSON, JJ., CONCUR.   RANDOLPH, J., CONCURS IN PART AND IN THE RESULT WITHOUT SEPARATE WRITTEN OPINION.   GRAVES, J., DISSENTS WITH SEPARATE WRITTEN OPINION JOINED BY DIAZ, J.; RANDOLPH, J., JOINS IN PART.**

**GRAVES, JUSTICE, DISSENTING:**

¶40.   My colleagues have chosen to reverse and remand this case for a new trial. However, based upon the evidence presented in the record, I am compelled to dissent. Although the majority elected not to address all of the issues raised by the parties,  I will address those issues.  A comprehensive review and analysis of the issues clearly demonstrates that the learned trial judge, when faced with a myriad of issues, was careful, thorough and correct in the handling of those issues. A more detailed examination of the issues, in full context, is

essential to an unabridged view of the correctness of the rulings made throughout the course of the trial below. For clarity, I will address each separate issue as presented by the parties.

## I.     Did the trial court err in denying Illinois Central's Motion for JNOV and Instructions D-1, D-2, and D-3?

¶41.    Illinois Central contends that the trial court erred when it denied Illinois Central's Motion for JNOV and Peremptory Instructions D-1, D-2, and D-3. At the close of Travis' case in chief, Illinois Central moved for a directed verdict. Illinois Central based the Motion for Directed Verdict on the fact that Travis' witness, Thelma Washington, testified that the train's horn was blowing and was audible to a motorist on the date of the accident, and that Travis' witness, Jimmy Calvin Scott, testified that the horn was blown in excess of the distance required under Mississippi law; that there were no obstructions to a motorist's view of the crossing in the southeast quadrant on the date of the accident, and that the failure of the train crew to apply the brakes prior to the accident played no part in the accident since Travis drove into the path of the approaching train.

¶42.    Travis counters these allegations by arguing that Illinois Central violated two Mississippi statutes governing its duties at crossings[1] and thus was negligent per se. Travis further asserts that Illinois Central's negligence in failing to make a proper grade and in failing to sound the horn at repeated intervals both contributed to Michael's death.

---

[1]Miss. Code Ann. §§ 77-9-225, 77-9-251.

28

¶43.    In order to determine if the trial court's denial of Illinois Central's Motion for a JNOV was warranted, an examination of the record (specifically testimony given at trial) is necessary.  On direct examination, Thelma Washington testified as follows:

Q:    Now, you were going to Jackson. And what route were you taking?

A:    Highway 49 South.

Q:    And about ten, tell the ladies and gentlemen of the jury what you saw happened as you were traveling 49 South.

A:    Well, I was driving down the road, a train was coming down the track.

Q:    And what crossing were you approaching, if any?

A:    Mileston.

Q:    And tell the ladies and gentlemen of the jury what you saw as the train was crossing – I mean, as you were coming down Highway 49 and the train was on the track?

A:    Well, what happened was, I was stopped at the crossing to let  my nephew out...and the train was coming so fast, and the track that went across – the truck started up, and all at once the tractor was there - I mean, the train was there, the truck was there. I was sitting there. It just all happened at the same time. It just hit. He started up the track and it just hit him.

¶44.    In relation to the audibility and the pattern in which the horn was blown, Washington had this to say during her testimony:

Q:    Now, when you were running parallel with the train, did you hear a horn?

A:    Steady thing, just blowing, steady.

Q:    And you heard that as you were driving?

A:     Uh-huh. Yes, I mean.

Q:     Where were you located in connection with the train?

A:     About, a little bit ahead of the train, but I was like that all the way back up by the trees, up near Tchula.

Q:     Now, describe for the ladies and gentlemen what you heard on the horn. Was it one continuous pattern, or was it a break or what?

Opposing Counsel:   Objection. Leading.

The Court:    Sustained.

Q:     What, if any, break in the pattern of the horn did you notice?

A:     No break.

¶45.   Miss. Code Ann. § 77-9-225 states:

Every railroad company shall cause each locomotive engine run by it to be provided with a bell of at least thirty (30) pounds weight and with a whistle or horn which can be heard distinctly at a distance of three hundred (300) yards, and shall cause the bell to be rung or the whistle or horn to be blown at the distance of at least three hundred (300) yards from the place where the railroad crosses over any public highway or municipal street. **The *bell* shall be kept ringing continuously or the *whistle or horn* shall be kept blowing at repeated intervals until said crossing is passed.**

Every person, company or corporation violating the provisions of this section shall be guilty of a misdemeanor and upon conviction shall be fined not more than Fifty Dollars ($50.00) or be imprisoned not more than thirty (30) days, or be both so fined and imprisoned, in the discretion of the court.

The provisions of this section shall be enforced by the Mississippi Department of Transportation.

(Emphasis added).

30

¶46.    In this case, the issue is on the pattern in which the *horn* was blown. Neither party addresses issues concerning a bell or a whistle.  Based upon the testimony of  Washington, the record establishes that although the horn was audible, it did not sound at repeated intervals, as required by Miss. Code Ann. § 77-9-225, until the crossing was passed. When questioned on cross-examination, Washington testified that Michael could not have seen the train if he had looked, because the tractor blocked his view of the approaching train from the truck. Washington also testified on cross-examination that there was nothing else which would have prevented Michael from looking up the track to detect a train approaching the crossing. The jury took this testimony into consideration when it returned the verdict and assigned 25% of the negligence to  Michael.

¶47.    Washington also testified to the condition of the track and the surrounding vegetation on the day of the accident:

    Q:    Describe the condition of the crossing over the years in 1997 to the ladies and gentlemen of the jury.

    A:    It was in poor condition, really. It was tearing- the crossing was like, you know, like a high railroad, not like the one you would go across regular.

    Q:    Okay. Tell the ladies and gentlemen of the jury about the condition of the vegetation out there as you observed while you lived out there, at the crossing.

    A:    There was tall bushes on the side of the track and some little trees and some tall Johnson grass.

    Q:    Now, you traveled that crossing on that day?

31

A: Yes.

Q: And you remember that day?

A: Yes.

Q: Describe the vegetation for the ladies and gentlemen of the jury on that day.

A: It was the same way. I had took the children across on the bus, and I had come back across on the bus and kept on going around. It was the same way.

Q: When you say "same way" same way as what?

A: Tall grass and little bushes.

¶48. On cross-examination, Ms. Washington had this exchange with counsel for Illinois Central:

Q: So the weeds you were referring to where you responded to questions by Mr. Sweet were weeds that were out there at a time other than on the date of the accident?

A: It was the day of the accident.

Q: And this is the train that was traveling the day of the accident. Do you see that Mr. Travis is lying here in the ditch next to the tracks?

A: Yeah, but could I say something?

Q: Yes.

A: See, what you're looking at is down in the ditch where he was laying, but if you're looking across the ditch to the train, it wouldn't look like that. Do you see those green things back there? It would be blocking, blocking you seeing the train and then, see, after he entered the ditch

32

here, its blowed up to look big now, but you know that, ditch ain't that big.

¶49.   Illinois Central also asserts that plaintiffs' witness, Alvin P. Haymer,[2] a resident of the Mileston community, testified that Exhibit D-118 shows the railroad track to be clear from obstructing vegetation. Further, it was stated by Illinois Central that from Haymer's preview of D-95, Haymer stated that there was no obstruction to a driver's view of the train approaching from the north to the south. The actual testimony of Haymer on cross-examination is as follows:

Q:    All right. I'm looking at 118 here. Even from the pictures as it's shown here, can you tell the jury what we're looking right at, where the light is? What is that light on?

A:    That's the railroad.

Q:    Is the railroad track above the weeds that you are referring to, the vegetation?

A:    Is the railroad above the weeds?

Q:    Yes.

A:    Yeah, the railroad is above the weeds.

Q:    Let's go to 132. Okay. That picture doesn't show it good there. This is 132. Do you see that?

A:    Uh-huh.

_____

[2]Alvin P. Haymer was not involved in the 1990 accident which took place at the Mileston crossing.

33

Q: On that same track that we were looking at on the other exhibit, there's a train there; is it not?

A: Yeah.

Q: Is it your testimony that a person traveling on this road here with the weeds which you can see below the tracks as you are approaching, that a person would not be able to look up and see the train coming? Is that your testimony? Because of this vegetation down here?

A: Yeah, because he's down. He's down. When the train get that close to the track and you drive up on the track, you don't see that train until you get up on that track.

Q: You're telling the jury that a person traveling on this road, going west across those tracks, if a train that like this one shown in this picture is up on the tracks, that a person could not see that train as they approach that crossing, even though the train is above the weeds or vegetation that you referred to?

A: Is above it. You look down that track and look back and that train boogying, you're hit if you're up on that track.

Q: My question is, is it your testimony to this jury that the train, as it's shown in this picture here, Exhibit D-132, would not be visible to a motorist traveling on this road if they looked north, up towards Tchula?

A: It's visible because he's coming up. When he get up, the train is in his face.

Q: All right. So your answer would be yes, you would be able to see it?

A: You might see it, but it's too late.

¶50. Haymer's testimony supports the fact that the Mileston crossing hump is 289% steeper than the grade recommended by industry standards.

34

¶51.    Furthermore, Travis' expert witness, Kenneth Wayne Heathington, offered testimony

on this  issue during his direct examination:

> Q:      Do you have an opinion to a reasonable degree of professional certainty
> whether Illinois Central provided proper and easy grade in the highway
> so that the railroad would be conveniently crossed at Mileston crossing
> back in May of 1997?
>
> A:      No. As stated a little bit earlier here, on the south side, the way that Mr.
> Travis was going, that grade or hump area exceeded AAR, which is the
> Association of American Railroad, and ASHTO by 289 percent. I mean
> that is a huge, big percentage. You're not supposed to have more than
> a six-inch drop or a three-inch rise in 30 feet from the nearest rail. Well,
> it exceeds almost 300 percent over that.

Heathington's testified on direct examination  that Illinois Central did not provide proper and

easy grades in the highway so that the railroad could be conveniently crossed.  The testimony

offered by Alvin Prince Haymer and Kenneth Wayne Heathington gives validity to the

argument asserted by Travis that Illinois Central violated Miss. Code Ann. § 77-9-251 which

states:

> Where a railroad is constructed so as to cross a highway, and it be necessary
> to raise or lower the highway, **it shall be the duty of the railroad company
> to make proper and easy grades in the highway, so that the railroad may
> be conveniently crossed, and to keep such crossings in good order.** It shall
> be the duty of the railroad company to erect and keep in order all bridges on
> any highway, at such points as bridges may be necessary to cross the railroad.
> Any company which shall fail to comply with these provisions within sixty
> days from the filing of written notice by the board of supervisors of the county
> in which said crossing is located, served upon the agent of said railroad
> company located in said county by the sheriff, as other processes are served,
> shall forfeit the sum of the cost of construction of said bridge or crossing, to
> be recovered by action in the name  of the county in which the bridge or
> crossing is situated, upon an itemized bill of cost of said work.

(Emphasis added).  In addition, Miss. Code Ann. § 77-9-247 provides that:

35

Every railroad corporation or company or person or persons operating or controlling any railroad track intersecting a public road or street at grade crossings shall erect and maintain at each such crossing the standard sign known as "railroad crossbuck," the design of which has been standardized by the Association of American Railroads and which appears in the "Manual on Uniform Traffic Control Devices" for the State of Mississippi as adopted by the Commissioner of Public Safety, the Mississippi Transportation Commission and the United States Department of Transportation.
Provided, further, that said railroad crossbuck shall be reflectorized and be placed in the right side of the road or street on both sides of the railroad and shall indicate the number of tracks crossing the road or street in accordance with the aforesaid manual on uniform traffic control devices.

The provisions of this section shall be enforced by the Mississippi Department of Transportation.

¶52. While it is not in dispute that a crossbuck was in place at the Mileston crossing, the testimony of plaintiffs' adverse witness, Kenneth Robinson, on direct examination does place into question the effectiveness of the crossbuck when applying the standards of the Manual on Uniform Traffic Control Devices (MUTCD):

> Q: Now, in having a duty to maintain a reasonably safe crossing, your duty would be to make sure vegetation was, in fact, kept down; isn't that right? It's your right of way?
>
> A: That would be part of it, yes.
>
> Q: I want to go to the crossbuck sign.
>
> A: All right.
>
> Q: Illinois Central's responsibility is to put that crossbuck sign in place; is that correct?
>
> A: Yes.

36

Q:     Now, I was asking this, on general maintenance, your job is to maintain that crossing; isn't that correct?

A:     As general maintenance, yes, sir.

Q:     And that crossbuck sign; isn't that correct?

A:     That would be part of it, yes.

Q:     And just so we can look at the issue of maintenance, the maintenance of this sign does not even comply with the requirements of Illinois Central to maintain crossbucks, is it?

A:     It's not a new sign, and I, no is trying to deny that a newer sign would be better than what we have there.

Q:     I'm not saying a newer sign. You-all have a specific requirement about the lettering and the condition of the crossbuck sign; isn't that correct?

A:     I have seen some diagrams to that effect. I don't know what they specifically say.

Q:     Whatever they say, this sign doesn't even comply with that, does it?

A:     It's faded, yes, sir.

Q:     This sign doesn't even comply with that?

A:     No, si, it would not.

Q:     So, just on the general maintenance of this crossing, the sign that you-all talk about, that's not even maintained?

A:     That particular sign is not, no, sir.

Q:     And this is at the sign at the Mileston crossing?

A:     Yes, sir.

37

¶53. Illinois Central countered by arguing that it is not required to maintain an obstruction-free crossing, nor is it required to maintain a crossing in a condition where no accident is possible. Illinois Central cites **Buffington v. Gulf & S.I.R.,**186 Miss. 132, 188 So. 563 (1939) as an authority for this argument. The Court in **Buffington** stated that a railroad must use reasonable care with regard to maintenance of a crossing so that they are reasonably safe "for persons who, using the crossing, exercise reasonable care for their own safety." However, based on the evidence presented at trial, Illinois Central did not present facts that overwhelmingly proved that Michael did not exercise reasonable care for his own safety. Illinois Central also asserts that Miss. Code Ann. § 65-1-175 entrusts the sole, exclusive jurisdiction to the Mississippi Department of Transportation for the installation of active warning devices, such as lights and gates, at public highway/rail crossings. Illinois Central also points out that in addition to Miss. Code Ann. § 77-9-249, "railroad companies may also be required to install additional warning devices at the direction of the Mississippi Department of Transportation" pursuant to Miss. Code Ann. § 65-1-175. **Woods v. Amtrak,** 982 F. Supp. 409, 411 (N.D. Miss. 1997).

¶54. Although Illinois Central alleged that no proof was presented at trial that it failed to comply with any mandate order of the MDOT with regard to the warning devices at the Mileston crossing, it is settled law that the authority granted to a state's department of transportation does not relieve individual railroad companies from common law duties to maintain its privately-owned crossings. **CSX Transp., Inc. v. Easterwood**, 507 U.S. 658, 113

38

S.Ct. 1732, 123 L.Ed. 2d 387 (1993). Also, this Court in ***Illinois Cent. R.R. v. Williams***, 242 Miss. 586, 135 So.2d 831 (1961), found that inadequate signalization by a railroad and the fact that there had been previous accidents at the crossing made this particular crossing unreasonably dangerous.

¶55. Illinois Central urges this Court to follow one of its previous rulings issued in ***Illinois Cent. R.R. v. Smith,*** 243 Miss. 766, 140 So.2d 856 (1962). In that case, this Court concluded that the reason the decedent did not see or hear the train in time to avoid the fatal accident was that he was not looking or listening, and this was the proximate cause of the collision with the decedent's automobile. However, viewing all of the testimony given during this particular trial and the statutes cited by both parties, I conclude that Travis presented substantial evidence in support of the verdict and the facts did not so overwhelmingly favor Illinois Central that reasonable persons could not have arrived at a contrary verdict. Therefore, the trial court did not err in denying Illinois Central's Motion for JNOV and instructions D-1, D-2, and D-3, which were peremptory.

> **II. Did the trial court err in allowing testimony regarding other accidents and other alleged near accidents at the Mileston crossing and in failing to grant Illinois Central's Motions for Mistrial?**

¶56. The evidentiary rulings of a trial court are entitled to substantial deference and this Court will review those rulings only for clear abuse of discretion. *See **Broadhead v. Bonita Lakes Mall, Ltd. P'ship,*** 702 So. 2d 92, 102 (Miss. 1997). The "admissions or exclusion of evidence is within the discretion of the trial judge and will not be reversed absent an abuse

of that discretion." ***Miss. Dep't of Transp. v. Cargile,*** 847 So.2d 258, 263 (Miss. 2003). For

a case to be reversed on the admission or exclusion of evidence, the defendant must show

that it resulted in harm and prejudice to a substantial right of the defendant. ***Cargile,*** 847

So.2d at 263 (citing ***K-Mart Corp. v. Hardy ex rel. Hardy,*** 735 So.2d 975, 983 (Miss. 1999)).

¶57.    On July 11, 2003, Illinois Central submitted its Motions in Limine, specifically

including Motion in Limine No. 6 seeking the exclusion of testimony regarding other alleged

collisions and/or "near" collisions at the Mileston crossing. At the Pretrial Conference, the

trial court ruled as follows on Illinois Central's Motion in Limine No. 6: "No. 6: Testimony

regarding other alleged collisions and/or near collisions at the subject crossing. As to

substantially similar circumstances, the Motion is denied." On September 22, 2004, the trial

court entered its Order on Motions in Limine submitted by Illinois Central, and ruled that

testimony regarding other alleged collisions and/or near collisions at the Mileston crossing

was denied to the extent such instances occurred under substantially similar circumstances.

¶58.    On September 25, 2003, at the continuation of the Pretrial Conference, the trial court

ruled that Travis could not present evidence regarding the Hawkins[3] accident of 1994 or the

Haymer accident of 1990. Specifically, the trial court prohibited Travis from mentioning

other accidents, and required that notice be given to the railroad before any such accidents

would be admitted. However, on the first day of trial, the trial judge reversed her ruling

---

[3]The Hawkins accident is the subject of this Court's opinion in ***Illinois Cent. R.R.
v. Hawkins***, 830 So.2d 1162 (Miss. 2002).

regarding evidence of other accidents, and advised that she had reconsidered Travis' Motion regarding other accidents. The trial judge stated that based upon *Illinois Central R.R. v. Williams,* 241 Miss., 586, 135 So.2d 831, 839 (1961), the Hawkins case was substantially similar to the Travis case, and that Travis could use the Hawkins case to show notice to Illinois Central of a dangerous condition existing at the Mileston crossing.

¶59. The standard for admission of evidence of other accidents or near accidents at a railroad crossing can be found in *Mitcham v. Illinois Central Gulf R.R.,* 515 So.2d 852, 855 (Miss. 1987), where this Court stated that evidence of prior accidents at a railroad crossing is admissible to show the existence of a dangerous condition and knowledge of such condition only upon a showing of substantial similarity of conditions. The admissibility of prior accidents is limited to conditions of permanence and the evidence must show that former accidents happened under substantially the same circumstances as those existing at the time of the accident. *Id.* at 856. *Williams,*135 So.2d at, 839. states that in order for accidents in other or different times to be admissible, cannot be too remote in time from the particular occurrence. *Williams* also held that previous accidents at the same railroad crossing are admissible in subsequent suits to show: "(1) the existence of a defective or dangerous condition... and (2) to show the defendant's notice or knowledge thereof." *Id.*

¶60. Illinois Central argues that the trial court committed unfair prejudicial error in admitting evidence of the 1994 Hawkins accident because the accident did not comport with the standard for admissibility. The Travis accident occurred on May 16, 1997 and the

41

Hawkins accident occurred on September 14, 1994. Illinois Central further contends that there was no showing that the conditions existing at the Mileston crossing for the Hawkins accident were similar to the Travis accident. Illinois Central also suggests that the trial court improperly relied upon *Williams* in deciding to admit evidence of the Hawkins accident because *Williams* was decided under the "occupied crossing doctrine." This means that the train entirely occupied the subject crossing at the time of the accident and vegetation did not factor into *Williams* at all.

¶61.    Travis counters these arguments by stating that as in this case, the railroad in *Williams* argued that the facts of two other accidents at the same crossings were entirely different, that the prior occurrences must involve "substantially" similar facts, and thus the evidence of the prior accidents should have been excluded. This Court disagreed with the railroad's argument in *Williams*, finding that the evidence was admitted for the purpose of showing notice to the railroad of unusual danger.

¶62.    Applying the standard set forth in *Williams*, the same conditions that made the Mileston crossing unusually dangerous in May of 1997 existed in 1994.  Specifically, the rough surface approaching the crossing had not changed and the slope, 289% greater than industry standards, had not changed. While the vegetation at the crossing was obviously not the same, it remained substantially unchanged. The evidence admitted by the trial court was used for the exclusive purpose of showing notice to the railroad of unusual danger.

42

¶63. Illinois Central makes the assertion that Travis' own witness, Alvin P. Haymer, testified subsequent to the trial court's ruling on the issue that the conditions existing at the Mileston crossing for the Hawkins accident and for the Travis accident had substantially changed between 1994 and 1997. While Haymer did testify that there had been substantial removal of trees between 1994 and 1997, he still had a concern about the vegetation. On direct examination, Haymer stated:

Q: Were there any difference in the crossing between 1994 and 1997, that you are aware of?

A: Was there any difference?

Q: Yes. Was there any change in the crossing from September of 1994 and May of 1997, as far as you are aware?

A: Yeah. There is difference in it now, but it wasn't then. It's worser.

Q: I am not asking about now. I'm talking about between 1994 and 1997, was the crossing essentially the same as you saw it in May of 1997 or during that time period?

A: Yeah, they made changes from '94. I don't know what year they changed it, but they made changed in it because the trees was up then. They cleared the trees down. Mostly you've got now is shrubs and vegetation growing up.

Q: Did they make any changes in the signs between 1994 and 1997?

A: The same buck sign. They ain't put no stop signs up there.

Q: Okay. Was there any changes - can you tell us whether or not there were any changes made to that slope heading up to the track?

A: The slope is the same.

On cross-examination, Mr. Haymer continued to mention the vegetation:

> Q:    The train goes up the tracks a ways, and there's a bunch of trees after
>       you get way down there.
>
> A:    That's right.
>
> Q:    I believe - am I correct in 1994, those trees came down a lot further?
>       The trees towards the Mileston crossing?
>
> A:    They come right at the crossing.
>
> Q:    All right. But in 1997, those trees had been cleared up, back to that
>       curve.
>
> A:    Yeah.
>
> Q:    That's the difference that you were talking about; right?
>
> A:    Yeah. Only thing we got now is the growing up vegetation; that's what
>       we got.

¶64.    After Illinois Central filed its appeal, this Court issued its opinion in ***Richardson v. Norfolk Southern Railway Co.***, 923 So. 2d 1002 (Miss. 2006). This wrongful death case also arose from an accident in which a train collided with a car crossing the railroad tracks at a grade crossing. The driver of the car died as a result of his injuries from the accident. The mother of the deceased driver sued the county in which the incident occurred and the railroad company for negligence. The plaintiff in ***Richardson*** asserted that the trial court erred in excluding evidence at trial of two other accidents at the same grade crossing. This Court stated in ***Richardson***:

> Turning to this case, Richardson attempted to introduce evidence of a prior
> accident which occurred at this same grade crossing on December 12, 1985.

This prior accident involving Matthew Bradley occurred over thirteen years prior to Mikie's accident on May 10, 1999. The other accident, involving Wendy McClure, occurred in January, 2003, over three and one-half years after Mickie's accident. Richardson argues that because both McClure and Bradley were traveling west across the same grade crossing when a Norfolk Southern train traveling north collided with their cars, the accidents are substantially similar and thus admissible. We do not agree. This Court has never found a period of time such as over thirteen-years close enough in time to be admissible. One accident occurring at the same location over thirteen years before Mickie's accident does not necessarily show an existence of a dangerous condition or that the defendant had notice or knowledge of a dangerous condition. Also, conditions at the scene obviously change over such a long period of time. Likewise, an accident occurring at the same location more than three and one-half years after Mikie's accident could not possibly be relevant to prove that a yet-to-happen 2003 accident put Norfolk Southern on notice in 1999 that a dangerous condition existed at the grade crossing at the time of Mikie's accident.

For these reasons, we find that the trial court did not abuse its discretion in excluding this "other accident" evidence. In excluding this evidence, the trial court's action was neither arbitrary, nor clearly erroneous, nor was it manifestly wrong against the overwhelming weight of the evidence. This issue is thus without merit.

*Id.* at 1010.

¶65. There are major differences, between the current case and ***Richardson***. In ***Richardson***, one of the cases that the plaintiff sought to introduce happened thirteen years prior to the death of her son. In this case, the 1994 Hawkins accident happened three years prior to Michael Travis' fatal accident at the Mileston crossing. In ***Richardson***, this Court stated that an accident which happened more than three and one-half years *after* the decedent's death could not be relevant in putting the railroad on notice that a dangerous condition existed at the grade crossing in 1999. However, this Court did not state in

45

*Richardson* that a three-year accident which happened *prior* to another fatal accident at the same crossing could not be used to prove that a railroad was on notice that a dangerous condition existed.

¶66.    Furthermore, in *Richardson*, the plaintiff sought to establish that the thirteen-year-old accident and the 2003 accident were substantially similar because the victims in these accidents were traveling west across the same grade crossing when a train hit them. In the current case, Travis does not argue that just because the vehicle was traveling across the same grade crossing is just cause for admitting the 1994 Hawkins accident. Travis specifically discusses the unchanged condition of the rough surface approaching the crossing, the slope,  and vegetation. Therefore, the prior 1994 accident and the 1997 Michael Travis case were not too remote in time and the conditions surrounding the accidents were substantially similar.

¶67.    Applying this analysis, the trial court did not abuse its discretion in admitting evidence of the 1994 Hawkins accident based on the factors set forth in *Williams*. Michael's accident occurred under substantially similar conditions as the 1994 Hawkins accident and that admission of this accident did not unfairly prejudice Illinois Central.  Therefore, a reversal for a new trial is not warranted.

46

**A.** **Did the trial court err in denying Illinois Central's Motion for Mistrial due to Travis' counsel's presentation of evidence regarding the Haymer accident?**

¶68. Whether to grant a motion for mistrial is within the sound discretion of the trial court. The standard of review for denial of a motion for mistrial is abuse of discretion. *Pulphus v. State,* 782 So.2d 1220, 1222 (Miss. 2001). The failure of a trial court to grant a motion for mistrial will not be overturned on appeal unless the trial court abused its discretion. *Bass v. State,* 597 So.2d 182, 191 (Miss. 1992).

¶69. Uniform Circuit and County Court Rule 3.12 provides as follows: "Upon motion of any party the Court may declare a mistrial if there occurs during the trial, either inside or outside the courtroom, misconduct by the party, the party's attorney, or someone acting at the behest of the party or the party's attorney, resulting in substantial and irreparable prejudice to the movant's case. Furthermore, the trial judge is in the best position to determine the impact of a particular occurrence. *Illinois Cen. R.R. v. Hawkins,* 830 So.2d 1162, 1176 (Miss. 2002).

¶70. Illinois Central argued that the trial court erred because it refused to grant a mistrial when Travis' counsel mistakenly referred to the Hawkins accident as the "Haymer" accident of 1990. Illinois Central moved for a mistrial because the trial court specifically limited Travis' inquiry only into the Hawkins case. The mistaken reference to "Haymer" happened during the direct examination of the Risk Manager for Illinois Central, Kenneth Robinson:

47

Q:     Now, I want to go back to first on Mileston crossing. The death of Michael Travis was not, in fact, the first death at that crossing; is that correct?

A:     That's correct.

Q:     Three other people died in 1994 at that crossing; isn't that correct?

Mr. Beckham: Your Honor, may we have a continued objection to this form of questioning?

The Court: You may have a continued objection.

Q:     Isn't that correct?

A:     That's correct.

Q:     In the Haymer case; isn't that correct?

Mr. Beckham: Your Honor, we object to that and would ask you to instruct the jury to disregard that.

The Court: What's the last part of that question?

Mr. Sweet: I'll rephrase the question, Your Honor.

Mr. Beckham: May we approach the bench, your Honor?

The Court: You may.

Mr. Sweet: I've misspoken; I meant to say Hawkins.

Mr. Beckham: We move for a mistrial. There's been on showing of any substantial or similar circumstance. This Court has ruled that no accident was admissible in this case, other than the Hawkins case; and he just said Haymer case.

Now, the jury has already heard about the Haymer accident in voir dire. Now, this – the Haymers were mentioned. They didn't hear about the Haymer accident. This is not relevant. They've heard about other accidents.

48

We ought to have a mistrial right now, just like the Court granted in the Hawkins case in 1999. This is the same situation, exactly the same. There's been no showing of any substantial set of circumstances.

Mr. Sweet: I misspoke. I said I would withdraw the question before I even went forward. I meant to say Hawkins case. And I will not question about that. I will specifically follow the Court's order.

The Court: Motion for mistrial is denied. Rephrase your question.

Mr. Beckham: Would the Court instruct the jury to disregard?
The Court: Defendant's objection was sustained; you are, therefore to disregard.

¶71. As previously discussed, the trial judge is in the best position to determine if a particular occurrence warrants a mistrial. Also, this Court has upheld the trial court's denial of a mistrial based on a mistaken remark, where the defendant failed to prove that the speaker was attempting to influence the jury. *Lee v. State,* 226 Miss. 276, 83 So.2d 818 (1955). Based upon her observation of the mentioned exchange during the trial, the trial judge concluded that a mistrial was not warranted. Travis' counsel explained to the trial judge that he misspoke and offered to withdraw the question. The trial judge accepted this explanation, sustained Illinois Central's objection and told the jury to disregard the initial line of questioning. Travis' counsel was instructed to rephrase the question to the witness. The trial judge made no mention or determination that the mistaken remark was an attempt to influence the jury and she used her broad discretion to continue with the trial.

49

**B.    Did the trial court err in denying Illinois Central's Motion for Mistrial regarding Thelma Washington's testimony of other accidents at the Mileston crossing?**

¶72.    Illinois Central also requested a mistrial based on the following exchange between Travis' counsel and Thelma Washington:

Q:    Tell the ladies and gentlemen of the jury what this meeting was concerning.

A:    It was concerning - talking about the meeting?

Q:    Before  Michael Travis' death.

A:    It was concerning getting some lights up at that crossing.

Q:    And why was it concerning - what was the reason that was being discussed?

A:    Because there were so many accidents.

Mr. Beckham: Objection, your Honor.

Mr. Blackmon: Mr. Sweet promised that he had told her not to mention other accidents, and she just did.

Mr. Beckham: Your Honor, we move for a mistrial. This is our third or fourth motion for mistrial. The Court has made specific orders concerning prior accidents. There's been no showing of substantial or similar circumstances. And not this jury just heard the word "prior accidents."

Mr. Sweet: She was not- she was told not to mention any of those specific accidents. And I specifically said, in a sensitive area, let me lead her so it won't even come up about other prior.

Mr. Blackmon: Your Honor, it doesn't -

50

The court: – Wait. Objection is overruled. Motion for mistrial is denied. And I will allow you to lead her for the specific purpose of directing her to this incident -

Mr. Sweet: yes, Your Honor.

The Court: Add to the other incident I've allowed.

According to the record, Travis' counsel informed the witness prior to trial that she could not mention other accidents. When Illinois Central pressed the trial court for a mistrial, it was denied. The trial court did not comment as to why she denied the motion for a mistrial, but a careful reading of the record leads to the conclusion that nothing in the mistaken reference to other accidents resulted in substantial or irreparable prejudice to Illinois Central. Therefore, the trial judge did not abuse her discretion in denying Illinois Central's motion for a mistrial.

### C.   Did the trial court err by allowing Annie Marie Sago to testify regarding other accidents at the Mileston crossing?

¶73.   During Sago's testimony, Illinois Central made a continuing objection to Sago's testimony regarding the 1994 Hawkins accident, which was noted by the trial court. Sago testified in that in 1994, an accident occurred at the Mileston crossing, resulting in the loss of life. Illinois Central contends that the testimony regarding the Hawkins accident from Sago was at least the fourth time the jury heard evidence of the Hawkins accident at trial, without any showing of similar circumstances surrounding the accident.

¶74.   As stated previously, the same conditions that made the Mileston crossing unusually dangerous in May of 1997 existed in 1994 and the trial judge did not abuse her discretion by

51

allowing evidence to be heard on the Hawkins accident. Therefore, the trial court did not err by allowing Sago to testify regarding other accidents at the Mileston crossing.

> **D.** **Did the trial court err in denying Illinois Central's Motion for Mistrial during the testimony of Sago?**

¶75. During Sago's direct examination by Travis' counsel, the following exchange occurred regarding a meeting in the Mileston community regarding the Mileston crossing:

Q: And what was the subject of that meeting? What were y'all having a meeting about?

A: We was trying to get a crossbar there because of the accidents.

Mr. Blackmon: Objection, Your Honor.

The Court: Sustained.

Mr. Blackmon: Your Honor, this witness made reference to accidents plural and, of course, the only admissible accident that's been mentioned thus far in the Court - and the Court has ruled - has been in 1994, and she is making it more than accidents; it's in violation of the Court's order. We have been up here several times and discussed this.

Mr. Sweet: She has been instructed not to identify any other accident other than 1994. I promise you that was a slip. I was telling her to make sure that you only mention 1994. It was clearly just a slip when she said what was the nature of the meetings. As best instance, I am allowed to lead so that people will won't slip. There is an objection and the Court sustained it. Your Honor, I would submit that there has been no details of any other accident or anything of that nature. She simply used plural when it was a slip on her.

The Court: Okay. The motion for a mistrial is denied and I will allow you to in whatever way to lead to make sure we don't have this occurring again.

Mr. Sweet: Yes, Your Honor.

¶76. Illinois Central contends that Travis failed to adequately inform and prepare the witness for her testimony. Illinois Central also points out that the trial court's prior ruling made it clear that no mention of the accidents at the Mileston crossing was permitted other than the 1994 Hawkins accident and the failure of Travis to follow the trial court's order resulted in the admission of prejudicial evidence. However, the trial judge once again used her discretion to deny Illinois Central's motion for a mistrial, but sustained its objection as to Sago's testimony concerning the use of the plural term "accidents." After Travis' attorney asserted that there was not an identification of any other specific accidents other than the one in 1994, the trial judge allowed him to lead Sago during questioning so as not to have another slip of the tongue.

¶77. Under these circumstances, Illinois Central was not prejudiced since there was not a specific identification of other accidents other than the 1994 Hawkins accident. Therefore, the trial judge did not abuse her discretion in allowing Travis' attorney to lead the witness on this matter and in denying Illinois Central's motion for a mistrial.

### E. Did the trial court err when it denied Illinois Central's Motion for Mistrial regarding the testimony of R.C. Howard?

¶78. R.C. Howard's testimony was presented by deposition at trial. Howard testified that he was almost hit by a train a couple of time prior to Michael's accident. At the conclusion of Howard's testimony, Illinois Central again moved for a mistrial regarding the admission of the near collisions. The trial court again denied the motion. Illinois Central asserts that not only was Illinois Central forced to defend the Travis accident, but it was also forced to

53

defend accidents which occurred years before Michael's accident. Illinois Central cites *Sawyer v. Illinois Central Gulf R.R.,* 606 So.2d 1069, 1076 (Miss. 1992), for the fact that this Court, in *Sawyer*, excluded evidence of near accidents, without precluding motorist's fault in causing the near accident. This Court also stated that, "the fact of a near-miss, and, for that matter, a hit, in and of itself proves very little and indeed may be quite prejudicial. *Id.* at 1075. However, prior to these statements, this Court acknowledged "that there are cases where evidence of near accidents may be admissible for the purpose of showing the dangerous character of a place and to show notice thereof to the person in control." *Id.* at 1075. In her discretionary authority, the trial judge admitted the deposition of Howard to show the dangerous characteristics of the Mileston crossing and also to show that Illinois Central had notice of the hazardous condition of the crossing. Therefore, the trial court did not err when it again denied Illinois Central's motion for a mistrial.

### III. Did the trial court err in denying Illinois Central's Daubert Motion to Exclude the testimony of Dr. Lipscomb, Travis' audiologist?

¶79. The standard of review governing the admission or suppression of evidence is abuse of discretion. *Haggerty v. Foster,* 838 So.2d 948, 958 (Miss. 2002). The admission of expert testimony is addressed to the sound discretion of the trial judge. *Roberts v. Grafe Auto Co.,* 701 So.2d 1093, 1098 (Miss. 1997). Unless the Court concludes that the discretion was arbitrary and clearly erroneous, amounting to an abuse of discretion, that decision will stand. *Id.* (citing *Seal v. Miller,* 605 So.2d 240, 243 (Miss. 1992); *Hooten v. State,* 492 So.2d 948, 950-51(Miss. 1986)). The standard for admissibility of expert witness testimony can be

54

found in *Daubert v. Merrell Dow Pharms., Inc.,* 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed. 2d 469 (1993).  Under the *Daubert* standard, the trial court is vested with a "gatekeeping responsibility" and must make a preliminary assessment of whether the reasoning and methodology can be properly applied to the facts in issue. *Miss. Transp. Comm'n v. McLemore,* 863 So.2d 31, 36 (Miss. 2003) (citing *Daubert v. Merrell Dow Pharms., Inc.* 509 U.S. at 592-93). The trial court must make the initial assessment of whether the reasoning underlying testimony is scientifically valid, and whether the reasoning can properly be applied to the facts at issue. 509 U.S. at 592-93. There must be a "valid scientific connection to the pertinent inquiry as a precondition to admissibility." *Id.* at 592. The party offering the expert's testimony must show that the expert has based his testimony on methods and procedures of science, and not subjective or unsupported speculation. *Id.* at 590.

¶80.    Illinois Central submitted its Motions in Limine on July 11, 2003, specifically including a Motion in Limine to preclude testimony by Dr. David Lipscomb. On September 25, 2003, the trial court entered its Order on Illinois Central's Motions in Limine, and specifically reserved ruling on Illinois Central's Motion in Limine until trial.

¶81.    At trial, prior to Dr. Lipscomb's testimony, Illinois Central renewed its *Daubert* objection to Lipscomb's testimony, and conducted a limited voir dire as to the foundation and reliability of his expert opinions. Following this voir dire, Illinois Central made a Motion to Exclude Lipscomb's testimony under *Daubert*. Specifically, Illinois Central moved to exclude Lipscomb's testimony on the following subjects and bases: any testimony the train

55

horn violated the FRA standard; that Lipscomb could not testify to a reasonable degree of scientific probability what the horn sounded on the date of the accident; any testimony that the horn should have sounded at some higher level than required by the FRA standards; any testimony interpreting any law or regulation, as Lipscomb was not a lawyer; any testimony that the horn should have been located in some other position; any testimony that the horn should have been sounded in short blasts; any testimony that short blasts of the horn would have reached Travis sooner, and any testimony regarding Lipscomb's tests of the surrogate vehicle. The trial court denied Illinois Central's **Daubert** Motion, finding the testimony to be relevant and reliable.

¶82.    Illinois Central argues that the Locomotive Inspection Act, 49 U.S.C.§ 20701 et seq. preempts the field of locomotive equipment. Further, that the Federal Railroad Safety Act of 1970, repealed and transferred to 49 U.S.C. § 20101 et  seq., likewise preempted the field regarding audibility of locomotive train horns. Illinois Central asserts that since FRA regulations have spoken to the issue of audibility of train horns, this issue is preempted as a matter of federal law. **United Transp. Union v. Foster,** 205 F.3d 851, 861 (5th Cir. 2000). Illinois Central also contends that Dr. Lipscomb's testimony did not show that the train's horn sounded below the FRA standard on the date of testing three years following the accident and that Lipscomb could not testify to a reasonable degree of scientific probability that the train's horn failed to sound below the FRA requirement on the date of the accident.

56

¶83.    Dr. Lipscomb was accepted by the trial court as one of the leading audiologists in the country[4] and as an expert qualified to testify about whether the locomotive's sounding device failed to give Michael warning of the approaching train. Dr. Lipscomb opined that the locomotive's horn could not be distinctly heard from a distance of 300 yards on the  day of the accident (the distance required by law), and that it did not alert Michael of the train's approach until one second before the train struck his vehicle. In arriving at these opinions, Dr. Lipscomb conducted a number of tests on both the vehicle and the locomotive horn. Since Michael's truck was destroyed when the locomotive struck it, Dr. Lipscomb obtained two vehicles of the same model driven by Michael. He was unable to get the same year model as Michael's, but took steps to assure himself that there was  no difference in the model years that would affect his testing.

¶84.    Furthermore, although Dr. Lipscomb does not possess a law degree, it would have been error to preclude his analysis of  FRA regulations because his theories and techniques

---

[4]Dr. Lipscomb holds B.A. and M.A. degrees from the University of Redlands and a Ph.D. in audiology from the University of Washington. He is a fully-tenured professor in the Department of Audiology and Speech Pathology at the University of Tennessee, and served as Director of the Notice Research Laboratory there from 1970 to 1987.

Dr. Lipscomb has served as an advisor to the Tennessee State Legislature on audiology matters, has provided testimony and data to the United States Congress on noise topics, and has been a panelist/consultant to the Federal Highway Administration. He has published books, chapters, and numerous articles in the area of audiology. Dr. Lipscomb is a member of the American Acoustical Society, American Auditory Society, American Speech and Hearing Association, and Southern Audiology Society, the National Hearing Conservation Association, the Washington Audiology Society, the American Academy of Audiology, and the American Board of Forensic Examiners.

were subject to peer review and publication. Plus, being an expert in his field, Dr. Lipscomb offered standard interpretations of the FRA regulations which are widely accepted in the industry. Dr. Lipscomb met all the **Daubert** requirements and his testimony did not violate any of these requirements.

¶85.    Illinois Central also errs by asserting that Travis' claims are preempted by federal law. Federal law does not preempt state law negligence claims based on inadequate warnings when federal funds were not used to improve the crossing. **CSX Transp., Inc. v. Easterwood,** 507 U.S. at, 665-73. (1993). In determining the scope of the Federal Railway Safety Act ("FRSA"), the U.S. Supreme Court found that language in the FRSA permitting the "States to adopt or continue to enforce any law, rule, regulation, order or standard relating to railroad safety until such time as the Secretary has adopted a.. regulation...covering the subject matter of such State requirement" indicates that preemption "will lie only if the federal regulations substantially subsume the subject matter of relevant state law." **Id.** at 658.

¶86.    This Court has recognized this particular principle in a case that involves the same railroad. See **Clark v. Ill. Cent. R.R.,** 794 So.2d 191 (Miss. 2001) (all parties agreed that claim of whether Illinois Central Railroad negligently failed to properly sound the locomotive's whistle "escapes the grasp of federal preemption"); see also **Norfolk S. Rwy. v. Shanklin**, 529 U.S. 344, 120 S.Ct. 1467, 146 L.Ed.2d 374 (2000).

¶87.    One of the railroad's defenses included an assertion that federal law preempted the plaintiff's claim. In the previously discussed **Richardson** case, this Court agreed that the trial

court correctly applied federal preemption law to the plaintiff's claims of inadequate signalization. This being said, the distinction between the **Richardson** case and the current case is that in **Richardson**, it was proven that federal funds were used for the installation of warning devices. In this action, federal funds were not used to improve the crossing, and there was no assertion by Illinois Central that federal dollars were used to improve the crossing. Furthermore, the Mississippi Legislature has codified a railroad company's duty to operate and maintain its crossings in a reasonably safe manner. Therefore, the trial court did not error in overruling Illinois Central's **Daubert** Motion to Exclude Lipscomb's testimony.

**IV.** **Did the trial court err by overruling Illinois Central's objection to Lipscomb's testimony regarding the manufacturer's specifications for the horn on the subject locomotive?**

¶88. Illinois Central argues that federal preemption bars any claim, rule, regulation, or statute that a train's horn should sound at a higher level. **United Transp. Union v. Foster** 205 F.3d 851 (5th Cir. 2000). At trial, Travis' counsel elicited testimony regarding the manufacturer's specifications for the horn on the Illinois Central locomotive on the date of the accident. Illinois Central objected on the grounds that the federal regulations have preempted this area. The trial court overruled this objection. Lipscomb testified that the horn should have been at 114dba.

¶89. As stated previously, in the **Easterwood** decision, the U.S. Supreme Court ruled that federal law does not preempt state law negligence claims based on inadequate warnings when

federal funds were not used to improve the crossing. Also, in *Clark*, all parties agreed that the claim of whether Illinois Central negligently failed to properly sound the locomotive's whistle "escapes the grasp of federal preemption." Based on the precedent established by the U.S. Supreme Court and this Court, federal preemption law does not bar Dr. Lipscomb's testimony concerning the manufacturer's specifications of the horn. Therefore, the trial court correctly overruled Illinois Central's objection to Dr. Lipscomb's testimony.

### V.    Did the court err by denying Illinois Central's Motion in Limine seeking to preclude Travis' expert Jim Scott from testifying?

¶90.    On July 11, 2003, Illinois Central submitted a Motion in Limine to exclude the testimony of Jim Scott, one of Travis' expert witnesses. Illinois Central sought to preclude Scott's testimony by alleging that he committed an illegal trespass onto Illinois Central's roadway on July 28, 1997. Illinois Central argued that this entry onto its roadway was not preceded by a request from Travis under Mississippi Rule of Civil Procedure 34, and that on this basis Scott's testimony was inadmissible under the *Daubert* standards. The trial court reserved ruling on Scott's testimony until trial. At trial, Illinois Central again objected to Scott's testimony. The trial court denied Illinois Central's *Daubert* Motion and the Motion in Limine regarding Scott's testimony.

¶91.    Mississippi Rule of Civil Procedure 34(a) provides that a party must serve notice on another party a request "to permit entry upon designated land or other property in the possession or control of the party on whom the request is served for the purpose of inspection and measuring, surveying, photographing, testing, or sampling the property or any designated

60

object or operation thereon, within the scope of Rule 26(b)." Mississippi Rule of Civil Procedure 34(b) provides that any such request "shall set forth the items to be inspected either by individual item or by category, and describe each item and category with reasonable particularity. The request shall specify a reasonable time, place, and manner in making the inspection and performing the related acts." Illinois Central argues that it did not receive any type of discovery document or request which preceded Scott's inspection of the roadway. Illinois Central sought to exclude the testimony of Scott as a sanction for Scott's alleged trespass.

¶92.    Miss. Code Ann. § 97-17-97 states:

> Except as otherwise provided in Section 73-13-103, if any person or persons shall without authority of law go into or upon or remain in or upon any building, premises, or land of another, including the premises of any public housing authority after having been banned from returning to the premises of the housing authority, whether an individual, a corporation, partnership, or association, or any part, portion or area thereof, **after** having been forbidden to do so, either orally, or in writing including any sign hereinafter mentioned, by any owner, or lessee, or custodian, or other authorized person, or by the administrators of a public housing authority regardless of whether or not having been invited onto the premises of the housing authority by a tenant, or after having been forbidden to do so by such sign or signs posted on, or in such building, premises, or land, or part, or portion, or area thereof, at a place or places where such sign or signs may be reasonably seen, such person or persons shall be guilty of a misdemeanor, and upon conviction thereof shall be punished by a fine of not more than Five Hundred Dollars ($500.00) or by confinement in the county jail not exceeding six (6) months, or by both such fine and imprisonment.

Within the record, there is no claim by Illinois Central that it issued notice to the public (orally or in writing) prohibiting persons from entering the property. The record does indicate

61

that Scott did enter the right-of-way in inspecting the accident scene, but without clear notice from Illinois Central prohibiting his entry on the right-of-way, it was not an actionable trespass. Also, no action was pending at the time Scott entered the right-of-way and in this situation the the trial court possessed broad discretion over discovery matters; therefore, its ruling will only be reversed where there has been an abuse of discretion. *Hayes v. Entergy Miss., Inc.* 871 So.2d 743, 747 (Miss. 2004) (citing *Cole v. Buckner,* 819 So.2d 527, 530 (Miss. 2002)). The trial judge weighed the evidence as presented by both parties and in her broad discretion denied Illinois Central's Motion in Limine to preclude Scott's evidence. Based upon the evidence, the trial judge did not abuse the broad discretion given to her concerning the discovery matters in this case.

¶93. Illinois Central further contends that the trial court erred in admitting Scott's expert testimony on the basis of substance and foundations of that testimony. However, Jim Scott is a licensed locomotive engineer whom the trial court accepted as an expert on the subject of train operations.[5] Scott met all of the *Daubert* requirements to be classified as an expert and Illinois Central's challenge to his testimony on these grounds are unfounded.

---

[5]For nearly 25 years, Jim Scott worked for CSX Transportation and its predecessor companies. At CSX, Scott was promoted to Road Foreman of Engines, District Road Foreman of Engines, and General Road Foreman of the Central Division. During his 23 years with CSX, Scott became familiar with the equipment on the train, including the locomotive event recorder (the train's black box). He was trained on the proper use and down-loading requirements for the event recorder by Pulse Electronics, which manufactured the event recorder on Locomotive 1005. Scott has also been qualified as an expert witness numerous times in both federal and state courts.

Furthermore, Scott's testimony did not serve to interpret Illinois Central's operating rules, but only to offer testimony concerning industry standards and how the physical evidence measured in comparison to those standards.

¶94.    Once again, Illinois Central's argues that Scott's testimony should have been excluded because Travis' claims are preempted by federal law. However, as previously discussed, Travis' claims are not preempted by federal law under the *Easterwood* analysis. Scott's testimony was correctly admitted by the trial court and there was no error by the trial court that warranted reversal of this decision.

**VI.    Did the trial court err by allowing the jury to view and Travis' expert witness Scott to testify regarding a video which Scott made of the Mileston crossing on July 28, 1997?**

¶95.    Illinois Central filed a Motion in Limine to exclude Jim Scott's video of the Mileston crossing made on July 28, 1997. Illinois Central contends that the video was made while Scott was trespassing on Illinois Central's property, and that the video did not reflect the conditions existing at the Mileston crossing on the date of the accident. The trial court reserved ruling on the video until trial.

¶96.    Illinois Central cites to *Illinois Cent. Gulf R.R. v. Ishee,* 317 So.2d 923, 925-26 (Miss. 1975), where this Court held that photographs of a rail crossing taken after a crossing accident are inadmissible, where they show circumstances other than those existing at the time of the accident. However, *Ishee* is distinguishable from the present case because in *Ishee*, the defendant railroad company had cleared the weeds from the right of way,

63

substantially changing the conditions and thus affecting whether the conditions of the experiment provided a fair comparison. Furthermore, this Court in *Ishee* stated:

> In order for a experiment of this type to be admissible, it is not required that all conditions shall be exactly reproduced, but that they must be so nearly the same in substantial particulars as to afford a fair comparison in respect to the particular issue to which the test is directed.

*Id.* at 926.

¶97. Here, the weeds had not been cleared away between the time of the accident and the time the video was made some two months later. Contrary to Illinois Central's argument, there is no evidence which suggests that the videotape shot only two months after the accident did not provide a fair depiction of the crossing on May 16, 1997. The video tape was properly admitted, and a new trial is not warranted.

**VII. Did the trial court err when it allowed Travis to redirect Travis' expert witness Jim Scott as to the speed of the of the subject locomotive?**

¶98. A Pretrial Order was entered in this case on October 7, 2003. Contained in the Pretrial Order was the following stipulation: the maximum speed for a freight train is 60 mph at the Mileston crossing. At the time of the collision, the train was traveling 52 mph (approximately 76.25 feet per second). Illinois Central alleges that during the redirect examination of Scott, Travis' counsel improperly questioned Scott as to the speed of the train and the throttle position of the train prior to the accident. Illinois Central objected on the basis that this testimony regarding the speed of the train was preempted by federal law.

¶99. During a bench conference to discuss this issue, the following exchange occurred:

64

Mr. Beckham: Your Honor, all allegations regarding the train speed are preempted in this case. We are going 8 miles per hour below FRA speed limit and any claim or inference at a lesser rate of speed should be precluded and we wish that the Court would instruct this jury that we were going at a proper speed and Mr. Sweet be precluded from inferring that one should have been traveling any slower speed.

Mr. Sweet: Sir, I am not referring to that. They are required to blow the whistle at that level. I am not arguing that they are speeding. There are several options to blow the whistle as the pattern requires you.

The Court: Overruled.

¶100. The trial court heard the explanation of Travis' counsel concerning this issue and overruled the objection of Illinois Central. While Illinois Central is correct in that the speed of its locomotive was within the federal guidelines and this issue was preempted by federal law, Travis' counsel made it clear that he was not arguing that the locomotive was speeding, but that he was referring to the various options to blow the whistle within the prescribed patterns listed in the Code of Federal Regulations. A discussion of the whistle pattern by Travis' counsel was not preempted by federal law for reasons previously mentioned; therefore, a curative instruction by the trial court was not needed. Thus, Illinois Central's contention that the trial court abused its discretion by refusing to issue a curative instruction to the jury is unwarranted, and a new trial should not be granted.

65

**VIII. Did the trial court err by denying Illinois Central's objections to portions of Illinois Central's train crew (A.C. Isaac and Arthur Irby) depositions regarding the training they received from Illinois Central?**

¶101. The standard of review for the admission of evidence is abuse of discretion. *Thompson Mach. Commerce Corp. v. Wallace,* 687 So. 2d 149, 152 (Miss. 1997). This Court will not reverse the admission or exclusion of evidence unless the error adversely affects a substantial right of a party. *Floyd v.City of Crystal Springs,* 749 So.2d 110, 113 (Miss. 1999).

¶102. Illinois Central argues that it was unfairly prejudiced by testimony from A.C. Isaac and Arthur Irby.[6] Illinois Central contends that federal law preempts claims for negligent training. However, once again, Illinois Central is mistaken in its repetitious use of federal preemption to defeat Travis' claims. In *Clark v. Illinois Cent. R.R.,* 794 So.2d 191, 195 (Miss. 2001), this Court stated:

> Principles of federalism operate with particular force to preserve traditional spheres of state law. The ultimate goal to be achieved, either through the application of state negligence law or federal regulations, is reasonable safety at grade crossings. It would be illogical and against firm public policy to find that the railroad has been excused from its common law duty to maintain an otherwise safe crossing simply because the FHWA signed off on a request for funds to install the passive warning devices at the crossing.

*Id.* at 196.

---

[6]Isaac and Irby were the conductors of the locomotive involved in the accident.

¶103. Both Irby and Isaac testified that they were not trained on certain aspects of grade safety. The deposition testimony was relevant as to the type of training and safety measures used by Illinois Central in order to make the Mileston crossing operational and safe. Furthermore, Illinois Central has cited no case law which has held that a railroad company's common law duty to adequately train its crew members and equip the crew to handle emergencies is preempted by federal law. The trial court did not commit prejudicial error by allowing the testimony of the crew members, and a new trial is not warranted.

> **IX.    Did the trial court err in denying Illinois Central's Motion in Limine and Daubert Motion to exclude the expert witness testimony of Kenneth Heathington?**

¶104. Illinois Central contends that Dr. Heathington's analysis and resulting opinions concerning the crossing utilized irrelevant factors under Mississippi law. Illinois Central also sought to exclude Dr. Heathington's testimony regarding Illinois Central's duty to install additional warning devices at the Mileston crossing. The trial court denied Illinois Central's Motions in Limine and its Motion to limit Heathington's testimony.

¶105. Dr. Heathington was accepted as an expert on the subjects of traffic safety by the trial court.[7] Dr. Heathington opined that the Mileston crossing was unreasonably dangerous on

---

[7]He has been qualified as an expert witness on in federal and state courts. As a licensed professional engineer, he holds a B.S. (Petroleum Engineering) and M.S. (Civil Engineering) from the University of Texas (Austin) and a Ph.D. (Civil Engineering) from Northwestern University. For more than 37 years he has been actively engaged in highway safety, highway design and operations, and traffic engineering including accident reconstruction. For 31 years, he worked specifically in railroad-highway grade crossing design, operation safety. He has authored more than 170 papers, reports, and

67

and before May 16, 1997, based on the analysis of the factors set forth in the Railroad-Highway Crossing Handbook. He arrived at this conclusion after a six-month safety analysis of the crossing. As a part of his analysis, Dr. Heathington conducted a personal site inspection of the crossing and other crossings in the rail corridor and reviewed numerous documents, including photographs and videos of the crossing, train timetable speeds and the number of trains using the crossing, depositions and other sworn witness statements, and accident history for the crossing, and a plan view with elevations prepared by licensed surveyors. He also oversaw and analyzed a traffic count prepared at his direction, which included the number and types of vehicles, including school busses and hazardous materials trucks, that use the crossing on a daily basis.

¶106. Dr. Heathington then evaluated this information under the standard of care established by the American Association of State Highway and Transportation Officials and the U.S. Department of Transportation, its Railroad Grade Crossing Handbooks, and requirements found in the Code of Federal Regulations. He found that the crossing had severely deficient

---

books on transportation engineering and highway safety. Now retired from the University of Tennessee, he holds the position of Professor Emeritus. Dr. Heathington has been Associate Administrator for Traffic Safety Programs, U.S. Department of Transportation; Associate Professor of Civil Engineering, Purdue University; and has held engineering positions with the Illinois Division of Highways, Texas Highway Department, and Continental Oil Company. In addition, Dr. Heathington has served as an advisor to the Tennessee State Legislature in transportation matters. He has testified on transportation policies and issue to the United States Congress and to various legislative and governmental committees and agencies, including hearings on proposed rule-making for the Federal Railroad Administration.

sight distances based on the speed of trains using the crossings and specifically based on 52-miles-per-hour (76 feet per second) speed. Dr. Heathington stated that the "sight distance restrictions may be even worse" based on the overgrown vegetation. Dr. Heathington testified as follows:

> Q: Do you have an opinion to a reasonable degree of professional certainty whether Illinois Central could have and should have installed lights and gates at the Mileston crossing before May 16, 1997?
>
> A: It should have been installed a long time before that.
>
> Q: What is the basis of your opinion?
>
> A: All of the characteristics that we reviewed, some that's still additional he put in his report, all of the things that have happened there over time, all of those such things are serious deficiencies in safety of the crossing.

¶107. Relying on *Illinois Cent. R.R. v. McDaniel,* 246 Miss. 600, 151 So.2d 805 (1963), Illinois Central asserts that the *only* test of whether a railroad crossing is unusually dangerous is the ability of the traveler to observe the approach of a train from the direction in which it is coming. While it is true that this test was utilized by the Court to analyze the railroad's failure to control vegetation along the right of way, which obstructed the motorist's view of the approaching train, this Court did not apply the same standard to the allegations of the railroad's failure to sound adequate warnings. *Id* at 811. Furthermore, Illinois Central's manager of engineering services testified that the factors set forth in the Railroad Highway Grade Crossing Handbook, which were the same factors Dr. Heathington applied to his

69

analysis of the Mileston crossing, were the proper factors to determine whether a railroad crossing is unusually dangerous and in need of additional warning devices.

¶108. After a careful review of the testimony and the evidence presented in the record, I conclude that all of Dr. Heathington's opinions were made to a reasonable degree of professional certainty. Dr. Heathington's theories and techniques have been subjected to peer review and publication. Dr. Heathington's opinions satisfy the ***Daubert*** requirements, and the trial court did not abuse its discretion by admitting his testimony.

X. **Did the trial court err by allowing Dr. Heathington to testify that the City of Tchula, Mississippi and Holmes County, Mississippi could not install safety devices at the Mileston crossing?**

¶109. On direct examination, Heathington testified that the city and the county could not install safety devices, such as a sign, on Illinois Central's right-of-way. Heathington further testified that the railroad must grant permission to a city or county to install safety devices on the railroad right-of-way. Illinois Central objected to Heathington's statements because he was a non-lawyer allegedly interpreting the law. The trial court overruled Illinois Central's objections.

¶110. On this point, Illinois Central's argument is misplaced. Dr. Heathington relied upon the deposition testimony of Stephen Edwards's, the Head of the Rails Division for the Mississippi Department of Transportation in developing his statements concerning the installation of safety devices. Furthermore, Edward's testimony was based on his professional experience and understanding of whether Illinois Central had the power and

70

responsibility of installing additional warning devices at the Mileston crossing before Michael's accident. Dr. Heathington was not interpreting the law, as alleged by Illinois Central, but utilizing testimony and factual data in order to present his professional opinion to the trial court. As previously mentioned, his statements, theories, and techniques are generally accepted within industry standards. Therefore, contrary to the views of Illinois Central, the testimony of Dr. Heathington on this subject was not improper and did not unfairly prejudice Illinois Central.

**XI.     Did the trial court err in allowing Dr. Heathington to testify that the conditions at the Mileston crossing on September 14, 1994 were substantially similar to the conditions existing on the date of the Travis accident?**

¶111.  At trial, Travis questioned Dr. Heathington regarding whether the conditions at the Mileston crossing existing on September 14, 1994, were substantially similar to the conditions existing at the crossing on May 16, 1997. Illinois Central objected to this line of questioning, and this objection was overruled by the trial court. Illinois Central asserts that Dr. Heathington's testimony regarding sight distances at the crossing was "patently false." On direct examination, Dr. Heathington testified as follows regarding the similarities of the conditions existing on September 14, 1994, and May 16, 1997:

Q:      Ok. Let's go to Number 6, and in making your analysis did you look to an accident that occurred on September 14th there, 1994.

A:      Yes, ma'am.

Q:    Do you have an opinion to a reasonable degree of professional certainty whether the accident at the Mileston Crossing on September 14th, 1994 was substantially similar to the accident on May 16th, 1997?

Mr. Beckham: We object to this, Your Honor.

The Court: Overruled.

Q:    What is your opinion?

A:    They are essentially the same. The train was going from left to right instead of right to left. Other than that, the vegetation, the trees and things are about the same, the roadway is the same, the crossbucks are the same, the motor vehicles going the same direction, the motor vehicle operator has to look in both directions for a train, so he essentially had the same - the same conditions.

Q:    And -

A:    They were both going about the same speed from all the information we have. They were slow, in the order of ten miles an hour or so.

Based on the research done by Dr. Heathington, the evidence overwhelmingly establishes substantial similarity between the two accidents. Dr. Heathington simply reviewed the evidence before him and noted that there was no massive cutting or changing or overgrowth in the intervening three years.

¶112.  Illinois Central also states that Dr. Heathington testified on cross-examination that there was zero sight deficiency in the southeast quadrant, supposedly the relevant quadrant at the Mileston crossing accident. The actual testimony of Dr. Heathington is as follows:

Q:    All right. Dr. Heathington, you don't disagree that from 79 feet from the nearest rail on the date of this accident, you can see that train like it's shown in D-112 all the way back as you described it in the area of the whistle post?

A:   I said - that's the way I calculated it, 70 feet from it, looking to the right, you had adequate sight distance. I said there's been a lot of people who've testified that there was a lot of vegetation out there, and you couldn't always tell that. I don't know. I wasn't there at the time. So rather than try to recreate that, which I didn't have adequate data to do that, I didn't use that.

Q:   You were just talking about the grass on the road?

A:   Wherever it may have been they are talking about.

Q:   Okay.

A:   Wherever that might be.

Q:   Okay. D-160. The particular, I'm just looking here at a portion of your sight distance analysis, Dr. Heathington, that you did in the year 2000.

A:   Yes.

Q:   And this deals strictly with the quadrant between - and I realize you want to say that those quadrants are involved. Right now, I just want to talk about the quadrant in the intersection between Michael Travis and the train. And what you found in the year 2000 was that for the Mileston Road - do you remember you said we got the roads mixed up?

A:   Yes.

Q:   That should that be Epps Road, 20 miles per hour, and that means no sight distance deficiency on Mileston Road; 10 miles an hour, no sight distance deficiency for Epps Road; correct?

A:   That's correct. What you got -

Q:   - Wait a minute. I'm going to let you explain, Dr. Heathington; I'm fixing to be through. That is the quadrant between Michael Travis's truck and this train; isn't it, sir?

73

A:      That's right. And that's what I explained earlier. And what I said was, you have a tractor in there and you have other things going on. And that's if he specifically looked and he was doing 10 miles an hour at 70 feet. Now, for all those other reasons of the tractor and things of this nature, he didn't look until - let's say 60 or 55 - let's say 55 feet from the nearest rail, and he looked and saw it. Then he would have gone through the perception reaction time, stopped the distance at 10 miles an hour, and his bumper would have been on the front rail, fell on the track, and he would have got it, just like he got hit. So, if he had to look at the 70 feet in order to be able to do that, and there was a lot of other activity going on - fairly substantial eyes activity.

Illinois Central's contention that Dr. Heathington testified that there was a zero sight deficiency in the southeast quadrant is flawed because the complete testimony offered by Dr. Heathington stated that there was substantial activity going on in this particular quadrant and that there would be a zero sight deficiency without all the other activity happening in this quadrant. The trial judge heard all testimony offered by this particular witness and in her broad discretion allowed the jury to consider it.

¶113.  Illinois Central also argues that the photographs viewed by Dr. Heathington clearly showed that substantial vegetation was removed from 1994 and 1997. Illinois Central further contends that the photographs taken on the day of the accident demonstrated that there was no obstruction to Michael's view of the approaching train. However, Dr. Heathington testified that the panoramic photographs offered by Illinois Central as an accurate representation of what Michael would have seen were not on point. Dr. Heathington reviewed the photographs and panoramic compilations of the photographs. Dr. Heathington then measured the sight distances in the "plan" view, which is a scaled diagram of the

74

crossing prepared by licensed surveyors retained by Travis, and compared the measurements against those in Illinois Central's photographs and panoramic compilations. Dr. Heathington then explained to the jury how the panoramic compilations distorted what Michael actually saw as the train approached the crossing:

Q: All right. Dr. Heathington, we have the plan view, and I have in front of you D-132. Tell me how you compare this panoramic to this plan view?

A: May I explain what is happening with the camera?

Q: Sure.

A: The scale on a photograph is not constant as it is here. This is one inch equals 60 feet. As you move from where the focal point is, that camera is shot away from that point, the scale changes.

If you use a 50-millimeter, which is the closest to what your eyes tend to see, you change I from that, and if you go lower than that, it is called a wide angle. I have one camera that has a 28, which is a real wide-angle lens. If you go above the 50, we normally talk about zooming in on something. So it looks closer than it really is and the scale is changed.

Now, whenever you put 1,2,3,4,5,6,7 photographs together, you have got a multiple of 7 times the scales of whatever they are in error on this supposedly panoramic view. This does not look like what you see if you are standing out there.

As it was previously stated in section IX, all of Dr. Heathington's opinions were made to a reasonable degree of professional certainty and he met all *Daubert* standards to be considered as an expert in his field. Therefore, the trial court did not abuse its discretion in admitting his testimony.

## XII. Did the trial court err in allowing Heathington to testify that other railroads voluntarily place active warning devices at their crossings?

¶114. At trial, Travis' counsel questioned Heathington regarding whether other railroads installed lights and gates at their railroad crossings at their own expense. Illinois Central promptly objected to this questioning, and the trial court overruled its objection. Illinois Central argues that the testimony was irrelevant due to the fact that the Mileston crossing is a public crossing, and railroads have separate and distinct obligations with respect to public and private crossings. Illinois Central also contends that the testimony offered ignores the mandates of Miss. Code Ann. § 65-1-175 which grants exclusive jurisdiction to the MDOT over the decisions to make such installations.

¶115. However, Illinois Central to ignores the following portion of Dr. Heathington's testimony:

Q:     Let me ask you this question.

A:     Okay. That was just another example.

Q:     Are there any restrictions on Illinois Central installing lights and gates at the Mileston crossing, that you know of?

A:     No, there is none. Other than you have to meet the MUTCD requirement, and you would normally go to the MDOT and say, "We'd like to put this in," and they'll give you permission to do it. It's like a building code in a city. A city determines the type and need of every building that's going to be built in the city. But if you're a developer and you go in with a set of building plans and you say, "I want to build this," you get permission to do it, unless you have got something weird.

Dr. Heathington testified as to what would be necessary in order for Illinois Central to install lights and gates at the Mileston crossing had the company chosen to do so. He simply provided an explanation as to the different requirements needed to install lights and gates at a private crossing and a public crossing. The testimony was relevant in order to give the jury a clear understanding of the procedures implemented to install safety devices at public and private crossings. This testimony did not unduly prejudice Illinois Central because the railroad does have a responsibility to maintain the Mileston crossing in good working order and maintenance/installation of safety devices is a part of that responsibility.

**XIII. Did the trial court err by denying Illinois Central's objections to Travis' Jury instructions, and by allowing the following instructions to be given either in whole or as amended?**

¶116. Jury Instruction P-3 reads as follows:

The Court instructs the jury that if you find from a preponderance of the evidence that Illinois Central Railroad Company failed to exercise reasonable care to maintain its right-of-way at the subject crossing with regard to vegetation during the period of time before the accident so that the crossing was not reasonably safe in that vegetation growing on the railroad right-of-way unreasonably and dangerously obstructed the view by such persons of approaching trains, and if you further find by a preponderance of the evidence that such failure, if any, by Illinois Central proximately caused or proximately contributed to the injuries to and death of Michael Travis, then you must return a verdict for Plaintiff Mary Travis, as Administratrix of Michael Travis's estate and on behalf of Michael Travis's Wrongful Death Beneficiaries.

¶117. Illinois Central objects to this instruction stating that the instruction is contrary to law and contrary to the facts presented by Travis' own witnesses. Illinois Central contends that the instruction omitted the fact that Illinois Central is only required to keep its right of way

in a reasonably safe condition for motorists taking reasonable care for their own safety.

However, the limitation requested by Illinois Central was expressed in Jury Instruction 6,

which was offered by Illinois Central and accepted by the trial court.[8] Furthermore, this Court

upheld the same instruction in ***Hawkins***, 830 So.2d at 1172.

¶118. Illinois Central is also in error by arguing that there was no evidence presented that

vegetation on the right of way caused or contributed to Michael's accident. Alvin Prince

Haymer testified tat the vegetation at the crossing, combined with the steep grade, meant that

a motorist would "have to get almost up there to see it [the train]." Dr. Heathington  testified

that visibility in all four quadrants impacted Michael's ability to see the approaching train

under the circumstances and contributed to the accident.

¶119.   Jury Instruction P-4 reads as follows:

> The Court instructs the jury that if you find from a preponderance of the evidence, that prior to May 16, 1997, Illinois Central Railroad failed to exercise reasonable care in erecting adequate warning devices at the Mileston Crossing so that the crossing was not reasonably safe for motorists like Michael Travis, or that the railroad should have placed more or different warnings than it did, and if you  further find by a preponderance of the evidence that such failure, if any, by  Illinois Central Railroad proximately caused or contributed to the injuries to and death of Michael Travis, then you must return a verdict for the Plaintiff Mary Travis, as Administratrix of

---

[8]Instruction No. 6 provided: "You are instructed that a railroad company owning rights-of-way in Mississippi such as Illinois Central under Mississippi law should exercise reasonable care to maintain public crossings so that they may be reasonably safe for persons who, using the crossing, exercise reasonable care for their own safety; a railroad company such as Illinois Central is not under a duty to maintain a crossing where no accident or injury is possible. You may not return a verdict against Illinois Central in this case merely because an accident occurred at the crossing."

Michael Travis's estate on behalf of Michael Travis's Wrongful Death Beneficiaries.

¶120. Illinois Central argues that this particular instruction is vague, as it imposed a duty on Illinois Central with regard to warning devices without giving the jury any rule of law as to when such a duty arises and does not detail what warning devices would be adequate at the Mileston crossing. Illinois Central also contends that this instruction imposed a duty on Illinois Central to install other warning devices in the absence of finding that the crossing was unusually dangerous.

¶121. Travis presented evidence that the warning device at the Mileston crossing was too close to the tracks and that the location of the crossbuck influences where a motorist will stop. Dr. Heathington testified that gates and lights at the crossing would have prevented this accident. This testimony gave the jury the chance to consider whether the railroad violated its duty to maintain a reasonably safe crossing and based on this testimony, the jury determined that the railroad was 75% at fault for Michael's death. The trial court did not err in allowing instruction P-4.

¶122. Jury Instruction P-9 reads as follows:

> This Court instructs the jury that there was in force in the State of Mississippi on May 16, 1997 a certain statute which provides that: Every railroad company shall cause each locomotive engine run by it to be provided with a bell of at least (30) pounds weight and with a whistle or horn which can be heard distinctively at a distance of three hundred (300 yards) and shall cause the bell to be rung or the whistle or horn to be blown at the distance of at least three hundred (300) yards from the place where the railroad crosses over any public highway or municipal street. The bell shall be kept blowing at repeated intervals until said crossing is passed.

79

This Court further instructs the jury that if you find from a preponderance of the evidence that Illinois Central Railroad Company violated any of the provisions of this law, and such conduct, if you so find, constituted negligence per se. If you further find from a preponderance of evidence that this conduct proximately caused or proximately contributed to the injuries to and death of Michael Travis, then you must return a verdict for the Plaintiff.

¶123. Amended P-9 reads as follows:

If you find from a preponderance of the evidence in this case that the Mileston Crossing was unusually dangerous as a result of the grade of the crossing, or the manner in which the crossing was kept, or the position or condition of the crossbuck at the crossing, then it was the duty of Illinois Central Railroad Company to exercise caution appropriate to the danger to avoid collisions with travelers on the roadway.

If you find from a preponderance of the evidence that:

1. The Mileston Crossing was usually dangerous as a result of the grade of the crossing, or the order in which the crossing was kept, or the position or condition of the crossbuck at the crossing; and
2. Illinois Central Railroad Company failed to meet the peril created with necessary precautions; and
3. Illinois Central Railroad's Company's failure to take necessary precaution proximately caused or proximately contributed to the injuries to and death of Michael Travis, then you must return a verdict for Mary Travis, as Administratrix of Michael Travis' estate and on behalf of Michael Travis' Wrongful Death Beneficiaries.

¶124. Illinois Central objects to Instruction P-9 on the basis that this instruction is vague; there was no evidence that the position of the crossbuck or condition of the crossbuck caused or contributed to the accident and that Illinois Central did not fail to comply with any mandatory condition contained in the Manual on Uniform Traffic Control Devices regarding the placement of the crossbuck. Illinois Central further objects on the basis that the

80

instruction allowed the jury to consider factors which were irrelevant in the determination of whether a crossing  is unusually dangerous.

¶125.  The initial P-9 instruction quotes Miss. Code Ann. § 77-9-225 verbatim, and is an accurate statement of the law and the railroad's responsibility for sounding the horn. There was also substantial evidence presented to the jury that the crew did not sound the horn in repeated intervals. Also, Travis presented evidence that the crossbuck did not meet the standards set forth in MUTCD; the grade at the crossing was 289% steeper than the grade recommended by industry standards; and the crossing was unusually dangerous under federal railroad standards, requiring active warnings. Furthermore, Illinois Central continues to assert that the *only* test for whether a crossing is unusually dangerous is the ability of the motorist to see the train from the direction in which it is approaching. This assertion is incorrect. As stated in Section  IX, this Court utilized this standard when analyzing the railroad's failure to control vegetation in the *McDaniel* decision. However, in this Court's continued discussion of the varying factors in *McDaniel* which denote whether a crossing is unusually dangerous, this Court mentioned the blowing of the whistle and the ringing of the bell of an oncoming train. Based on this discussion, the *McDaniel* opinion presents a two-part analysis concerning the test for whether a crossing is unusually dangerous - a test which incorporates sight and sound. Subsequently, Illinois Central's elimination of one of the prong's of this test makes its assertion inaccurate. Therefore, the trial court did not err in allowing instruction P-9 to be admitted for consideration by the jury.

¶126.  Instruction No. 12 (D-6) as amended reads as follows:

Under the law of the State of Mississippi, a motorist approaching a railroad crossing has a duty to look at and heed any traffic signs, has a duty to look for a train and has a duty to listen for a train's horn.

Accordingly, if you find that Michael Travis either:

1.      Failed to look for a train; or
2.      Failed to listen for the horn of an approaching train; or
3.      Failed to yield to the train upon hearing the train's horn when he could have done so through the use of reasonable care; or
4.      Failed to yield to the train upon seeing it when he could have done so through the use of reasonable care; then, in either of those events, Travis was negligent.

If you find from a preponderance of the evidence that such negligence, if any, was the sole, proximate cause of the accident, then in that event, you shall return a verdict for the Defendants.

You are instructed that under the law of the State of Mississippi whenever any person driving a vehicle approaches a railroad crossing the driver of such vehicle shall stop within 50 feet but not less that 15 feet from the nearest rail of such railroad, and shall not proceed until he can do so safely when:

a.      A train is approaching within approximately 900 feet of the crossing sounding its horn, and such train, by reason of its speed or nearness to such crossing, is an immediate hazard; or when

b.      An approaching train is plainly visible and is in hazardous proximity to the crossing.

You are further instructed that under the law of the State of Mississippi, at any crossing with a visible railroad crossbuck sign, the driver of an approaching vehicle shall, in obedience to the crossbuck sign, yield the right-of-way and slow to a speed reasonable for the existing conditions, and shall stop if required for safety no closer than 15 feet from the nearest rail, and the vehicle driver shall not proceed until he can safely do so.

You are further instructed that a violation of this law by Michael Travis shall not of itself defeat recovery, and the question of negligence or the violation aforesaid shall be left to the jury.

¶127. Illinois Central contends that the trial court made "substantial deletions" from its proposed four-page instruction. Illinois Central asserts that the instruction as offered would have instructed that the jury could find Michael Travis solely responsible for the accident. The instruction given did just that. The jury was instructed that Michael Travis was negligent if the jury found that he failed to look or listen or yield and that they should return a verdict for the defendants if Michael's negligence was the sole proximate cause of the accident. The instruction (and the court's amendment) also incorporated the language of Miss. Code Ann. § 77-9-249.

¶128. Upon close review of this instruction, it seems that Illinois Central's major objection to the instruction is that the trial court's amendment to the instruction made it a comparative negligence instruction:

> The Court: I'll add to instruction D-6, at the end of the second paragraph page two, you are further instructed that – you are further instructed that if you find a violation of this section – of this law or if you find that Travis violated this law, it shall not of itself defeat recovery, and the question of negligence for the violation shall be left to the jury - and a comparative negligence shall be left to the jury. So we will give a comparative negligence instruction.

The jury clearly understood this instruction because it found Michael Travis to be 25% at fault. The instruction was not contrary to the law, and the trial court did not err in granting this instruction.

¶129. Jury Instruction No. P-2 reads as follows:

The Court instructs the jury that on May 16, 1997, the railroad crossing in Milestone where the collision in this case happened was a public crossing and that Mississippi law required Illinois Central Railroad Company to exercise care in maintaining a reasonably safe crossing to the traveling public, including Michael Travis.

¶130. Illinois Central objects to the instruction on the basis that it is an incorrect statement of law because it did not specifically qualify the Illinois Central's obligation as applicable only to a person exercising reasonable care for their own safety. Standing alone, this instruction would be questionable, but taken with Instruction No. 6, the trial court did not err in allowing the instruction.

¶131. Instruction No. 6 provides:

You are instructed that a railroad company owning rights-of-way in Mississippi such as Illinois Central under Mississippi law should exercise reasonable care to maintain public crossings so that they may be reasonably safe for persons who, using the crossing exercise reasonable care for their own safety; a railroad company such as Illinois Central is not under a duty to maintain a crossing where no accident or injury is possible. You may not return a verdict against Illinois Central in this case merely because an accident occurred at the crossing.

Instruction No. 6 does specify the railroad's obligation as applicable to only persons exercising reasonable care for their own safety. Furthermore, Instruction No. 6 was offered by Illinois Central and granted by the trial court. Therefore, the trial court did not err in granting Instruction P-2.

84

**XIV. Did the trial court err in denying or amending jury instructions proposed by Illinois Central?**

¶132. Jury Instruction D-1 reads as follows: "The Court instructs the jury to return a verdict for oath of the Defendants, Arthur Irby and Illinois Central Railroad Company." Jury Instruction D-2 reads as follows: "The Court instructs the jury to return a verdict for Arthur Irby." Jury Instruction D-3 reads as follows: "The Court instructs the jury to return a verdict for Illinois Central Railroad Company."

¶133. As stated previously in Section I, the trial court did not err in denying proposed instructions D1-D3 because Travis presented substantial evidence in support of the verdict and the facts did not so overwhelmingly favor Illinois Central that reasonable persons could not have arrived at a contrary verdict.

¶134. As previously discussed in Section XIII, contrary to the assertion made by Illinois Central, the deletions and amendments to D-6 by the trial court do not warrant a new trial because the jury clearly understood this instruction and found Michael Travis to be 25% at fault. The instruction was not contrary to the law and the trial court did not err by amending this proposed instruction.

¶135. Proposed Instruction D-7 reads as follows:

> You are instructed that Michael Travis was negligent as a matter of law by failing to yield to the approaching train which was plainly visible as he made his final approach to the crossing.

> If you find by a preponderance of the evidence that such negligence was the sole, proximate cause of the accident, you shall return a verdict for all of the Defendants.

85

Clearly, Illinois Central based this instruction upon its interpretation of the ***McDaniel*** case.

As stated previously in Section XIII, the ***McDaniel*** opinion presents a two-part analysis

concerning the test for whether a crossing is unusually dangerous - a test which incorporates

sight and sound and does not hinge solely on the whether nor not the motorist is able to see

the train. Therefore, the trial court did not err by refusing Instruction D-7.

¶136.   As amended Instruction D-8 reads as follows:

> You are instructed that the law governing the operation of trains is different from the law applicable to the operation of automobiles. Accordingly, in determining the facts of this case, you should disregard any preconceived notions concerning the law governing the operation of automobiles, and follow those instructions given to you by the Court concerning the operation of train locomotives when considering the operation of the train in this case.
>
> Under the law of the State of Mississippi a train is not required to stop or slow down merely because it may be approaching an intersection with a public road.
>
> Under the law of the State of Mississippi, railroad employees who operate trains have a right to assume that vehicles approaching a crossing will observe any visible traffic signs, and will yield to any train that is plainly visible and in hazardous proximity to the crossing and will yield to the  sounding of the train's horn, until such time as it should have reasonably  become apparent to the train crew that the vehicle is not going to yield to the train.
>
> You are instructed that, as a matter of law, all legal responsibility for determining  the rate of speed for trains at a grade crossing is vested in the United States  Government and is determined by federal regulations.
>
> You are further instructed that the Court finds as a matter of law that the speed at which the train was traveling at the time of the accident was below the train speed established for this crossing.
>
> Accordingly, in your deliberations of this case, you may not consider in  any manner whatsoever whether the train should have been traveling at a lower rate of speed or whether the train crew was negligent in failing to operate the

86

train at a lower speed prior to the time that it should have appeared that Travis would drive his vehicle into the path of the train.

¶137. D-8A as amended reads as follows:

The Court instructs you that the train crew was only required to sound its horn at intervals at least 900 feet from the Mileston crossing in accordance with the other instructions given to you by the Court. You may not base any verdict against Illinois Central or Arthur Irby upon any contention that the horn should have been sounded at a distance greater than 900 feet from the Mileston crossing or based on any contention that any interval in the horn pattern was not long enough.

¶138. Illinois Central contends that if left as written, D-8 would have instructed the jury that Illinois Central could not be found liable for failure to slow the train or apply the brakes of the train at an earlier point in time since these actions would not have prevented the accident. Illinois Central also argues that there was no evidence that any failure to sound the horn in a particular pattern caused or contributed to the accident. However, after hearing the arguments of both parties, the trial judge (in her discretion) opted to amend Instructions D-8 and D-8A. Based on the record, there was nothing so overwhelming and convincing in the evidence which necessitated that the trial court submit D-8 and D-8A to the jury as originally drafted.

¶139. Instruction D-9 as amended reads as follows:

You are instructed that a railroad company owning rights-of-way in Mississippi such as Illinois Central under Mississippi law should exercise reasonable care to maintain public crossings so that they may be reasonably safe for persons who, using the crossing, exercise reasonable care for their own safety; a railroad company such as Illinois Central is not under a duty to maintain a crossing where no accident or injury is possible. You may not

87

return a verdict against Illinois Central in this case merely because an accident occurred at this crossing.

¶140. Illinois Central contends that as originally drafted, Instruction D-9 would have instructed the jury on matters preempted by federal law. Illinois Central further asserts that the instruction would have instructed the jury regarding the installation of other warning devices at the crossing, and would have instructed the jury regarding Illinois Central's placement of the crossbuck sign at the crossing. Illinois Central continues to put forth legal arguments which were considered by a jury in the presence of the trial judge. As stated previously, the evidence was not so overwhelmingly in favor of Illinois Central as to warrant a reversal due to the modification of Instruction D-9.

### XV. Did the trial court err in allowing portions of Steven Edwards' deposition to be presented to the jury during Dr. Heathington's testimony?

¶141. Illinois Central objected to the video testimony of Steven Edwards on the basis that Edwards was not a witness at the trial in the case, Edwards was not an employee at MDOT at the time of the accident, and Edwards therefore could have no personal knowledge of MDOT's policies in effect at the time of Michael Travis' accident. The trial court overruled Illinois Central's objection. Illinois Central also argues that no proper foundation was laid for Edwards's opinion testimony under M.R.E. 702.

¶142. Initially, Illinois Central errs in its analysis of Edwards' testimony by stating that M.R.E. 702 governs the requirements of the admission of the Edwards' opinion testimony.

The proper rule under which to analyze Edwards' opinion testimony is Rule 701 concerning

opinion testimony by lay witnesses:

> If the witness is not testifying as an expert, the witness's testimony in the form
> of opinions or inferences is limited to those opinions or inferences which are
> (a) rationally based on the perception of the witness, (b) helpful to the clear
> understanding of the testimony or the determination of a fact in issue, and (c)
> not based on scientific, technical, or other specialized knowledge within the
> scope of Rule 702.

The comment to M.R.E. 701 states:

> The traditional rule regarding lay opinions has been, with some exceptions, to
> exclude them from evidence. Rule 701 is a departure from the traditional rule.
> It favors the admission of lay opinions when two considerations are met. The
> first consideration is the familiar requirement of first-hand knowledge or
> observation. The second consideration is that the witness's opinion must be
> helpful in resolving the issues.

Under M.R.E. 701, the deposition testimony of Steven Edwards was clearly admissible as

lay testimony because it was helpful in assisting the expert witness (Dr. Heathington) in his

assessment of whether or not the Mileston crossing was unusually dangerous and whether

or not Illinois Central had the power and responsibility of installing additional warning

devices at the Mileston crossing before Michael's accident. Also, the lay opinion of Edwards

was helpful to the jury in establishing a clear understanding of the  testimony offered by Dr.

Heathington to resolve the issues surrounding the Mileston crossing-specifically those issues

of fact concerning whether the crossing was unusually dangerous and Illinois Central's

responsibility of installing additional warning devices at the crossing.  Therefore, the trial

court did not err in allowing portions of the Edwards' deposition to be presented to the jury during Dr. Heathington's testimony.

## XVI. Did the trial court err in allowing Travis to introduce a plan view of the Mileston crossing?

¶143. In its pretrial Motions in Limine, Illinois Central objected to any reference by Dr. Heathington to other quadrants of the Mileston crossing. The trial court reserved ruling on Dr. Heathington's testimony on this point in its Order on Illinois Central's Motions in Limine. At trial, Illinois Central again objected to Dr. Heathington's plan view of the crossing, which was overruled by the trial court.

¶144. Illinois Central argues that Dr. Heathington's plan view of the Mileston crossing depicted irrelevant quadrants of the Mileston crossing and was prepared nearly three years after the subject accident. Illinois Central continues to make the repetitive argument that under the standards of the *Ishee* case, the conditions of Dr. Heathington's plan view at the Mileston crossing were substantially different than on the date of Michael's accident. However, as previously stated under Section VI, *Ishee* is distinguishable from the present case because in *Ishee*, the defendant railroad company had cleared the weeds from the right of way, substantially changing the conditions and thus affecting whether the conditions of the experiment provided a fair comparison. Dr. Heathington reviewed the evidence and noted that there was no massive cutting or changing in the overgrowth in the intervening three years. Consequently, there is no evidence in the record that the trial judge abused her

90

discretion in allowing Dr. Heathington's plan view and testimony to be considered by the jury.

## XVII. Did the trial court err in allowing Heathington to testify regarding photographs and what Travis saw on the date of the accident?

¶145. At trial, Travis' counsel questioned Dr. Heathington regarding Illinois Central's photographs of the accident scene to determine whether they depicted what Travis saw on the day of the accident. Illinois Central objected on the basis that Dr. Heathington was never qualified as an expert on photographs or photographic comparisons. The trial court overruled Illinois Central's objection. Illinois Central also objected to Dr. Heathington's testimony regarding the photographic comparisons of Illinois Central's panoramic photographs to Dr. Heathington's plan view. The trial court overruled Illinois Central's objection to Dr. Heathington's testimony comparing Illinois Central's panoramic photographs to the plan view.

¶146. Dr. Heathington is a civil engineer, experienced in reviewing plans and angles. He measured the sight distances in the plan view which is a scaled diagram of the crossing prepared by licensed surveyors retained by Travis. As stated previously, all of Dr. Heathington's opinions were made to a reasonable degree of professional certainty and his theories and techniques applied to formulate his opinions can and have been tested. Therefore, his opinions were not mere speculations, but scientifically tested and accepted by the general professional community. The trial court did not abuse its discretion on this score.

**XVIII.** **Did the trial court err by admitting into evidence and in allowing testimony regarding the revised report of Dr. Thompson, Travis' economist?**

¶147. On the first day of trial, Travis's counsel supplemented the expert opinion of Dr. Thompson, Travis's expert economist, regarding his opinions as to the present net cash value for Travis' earnings. Illinois Central objected to this supplementation as untimely because the report doubled the present net cash value of Travis' earnings from his previous report. The trial court denied Illinois Central's motion to exclude the supplementation of Dr. Thompson's opinions. The initial report submitted by Dr. Thompson assessed the present value of Travis' future earnings less personal consumption expenditures at $241,595.00 However, the supplemented report provided the present value of Travis' future earnings less personal consumption expenditures as $489,058.00.

¶148. Illinois Central also asserts that Mississippi Rule of Civil Procedure 26(f) requires a party to seasonably supplement their discovery responses. While this is certainly true, whether a discovery supplementation is reasonable must be determined on a case-by-case basis looking at the totality of the circumstances. ***Blanton v. Bd. of Sup'rs,*** 720 So.2d 190, 195-96 (Miss. 1998). In **Blanton**, this Court found that a supplemental expert witness disclosure filed 6 days prior to trial was not seasonable under M.R.C.P. 26(f), was prejudicial to the opposing party, and that the trial court's exclusion of the supplemental report was proper. This Court upheld the trial court's exclusion of the supplemental report citing in its reasoning that it was within the judge's discretion to exclude the supplemental report given

the inherent complexity of the eminent domain proceeding coupled with the crucial nature of the appraiser's report. *Id.* at 196. *See* also ***Motorola Comm. & Elecs, Inc. v. Wilkerson***, 555 So.2d 713, 718 (Miss. 1989) (upholding supplementation identifying expert for first time ten days before trial found reasonable given limited nature of testimony); ***McKenzie v. Supervalu, Inc.,*** 883 So.2d 1188, 1191 (Miss. Ct. App. 2004) (upholding trial court's determination to admit supplemental report by expert because the expert used same formulas for supplemental report that were used in the initial report).

¶149.   Also, on direct examination Dr. Thompson testified as follows:

Q:      Is that a copy of the report you prepared at our request?

A:      Yes, sir, it is.

Q:      In connection with the present value of future earnings of Mr. Michael Travis?

A:      That is correct.

Q:      And was - did you originally prepare a report of this type in April of 2000?

A:      I believe the first one was April 10th of 2000, and this was just revised about
        a week ago.

Q:      And what was the purpose of your revision?

A:      Basically the revision is that since the one on April 10th of 2000. There
        have been new life expectancy tables which calculate the length of the
        life a person is expected to live, and there have been some new personal
        consumption expenditures, which I assume we'll talk about, that have
        been, for people of his age and marital status.

93

¶150. On cross-examination Dr. Thompson testified as follows:

Q:     I believe your first report was dated April 10th, 2000?

A:     That is correct.

Q:     And you - uh - I think recently amended that report?

A:     That is correct. That is what we were talking about a moment ago.

Q:     Okay. I believe you said you amended it or changed it because of additional information, some changes that had occurred since you issued your first report?

A:     Actually, not changes, but additional information that I've received since then.

Q:     What additional information did you receive?

A:     As I testified a moment ago, the new mortality tables.

Q:     Hold up. I'm going to write it down. You've got a new mortality table. Okay. From where?

A:     The Department of Health and Human Services, Center for Disease Control and National Vital Statistics.

Q:     When did they issue that new report?

A:     It was issued December 19th, 2002.

Q:     December 19th, 2002. Okay, what else?

A:     The other thing was the court case from the Mississippi Supreme Court that used a personal consumption expenditure of 30 percent.

Q:     When was that case rendered?

A:      I'm not sure. I think in 2000, but I'm not sure exactly of the date.

¶151. Based upon the testimony given by Dr. Thompson, he supplemented his report due to the changes in the life expectancy tables which were issued December 19, 2002, and a case issued by this Court that used a personal consumption expenditure of 30 percent. Dr. Thompson's original report also made clear that an update might be necessary prior to trial. The trial court judge heard the testimony, reviewed both reports, and in her broad discretion admitted the supplemented report. Using the rationale as stated in **Blanton**, this Court must determine on a case-by-case basis whether supplementation was reasonable under M.R.C.P. 26(f). Due to the issuance of the new life expectancy tables and this Court's usage of a personal consumption expenditure of 30 percent, the decision of the trial judge to admit the supplemented report was justified.

**XIX. Did the trial court err by allowing Travis to present testimony regarding meetings which took place in the Mileston community before and after the Travis accident?**

¶152. Illinois Central submitted a Pretrial Motion Limine to exclude any mention of a meeting which took place in the Mileston community following the Travis accident, regarding the installation of lights and gates at the Mileston crossing. During the Pretrial Conference, the trial court reserved ruling on this Motion in Limine. At trial, the trial court excluded a film of the post-accident community meeting, but allowed testimony regarding the meeting to show notice to Illinois Central of the dangerous conditions existing at the Mileston crossing.

¶153. Based upon the testimony and evidence presented at trial, the trial court did not abuse its discretion in allowing evidence of a meeting that took place in the Mileston Community prior to Michael's death. The testimony presented did establish that a representative of Illinois Central was present at the meeting and that the community discussed the dangerous nature of the Mileston crossing, plus the need for additional warning devices. Evidence pertaining to the meeting was directly related to whether Illinois Central had notice of the dangerous conditions prior to Michael's accident. Illinois Central also argued that this evidence should have been excluded because some of the witness did not know the name of the railroad representative and could not give the exact date of the meeting. Thus, it was well within the discretionary authority of the trial judge to allow the jury to weigh the evidence and decide who was more believable on these issues. It is within the sound discretion of the jury to accept or reject testimony of a witness, and the jury may give consideration to all inferences flowing from the testimony. *Mangum v. State*, 762 So. 2d 337, 342 (Miss. 2000).

¶154. Also, Illinois Central contends that the trial court erred by allowing Travis to present testimony regarding a meeting which took place after the Travis accident. While it is true that the trial court excluded the videotape of that meeting, there is no citation to any actual testimony being given at trial discussing the meeting. However, during the pretrial motions by the defense (in chambers), the trial court made the following findings:

> The Court: The Court has taken the motion under advisement on the video tape of the community meeting at Mileston Crossing. The Court has reviewed those video tapes, which I saw both - there was the same thing, it was not two

96

separate, one was just longer than the other one. Make sure I did not miss anything.

The Court finds that the meeting just - the prejudice is just so much outweighed by any probative value that you could get from those - those video tapes of that meeting at Mileston Crossing.

The Court will allow - I am not sure you have a witness that was at that meeting, that that person was present at the meeting and the topics that were discussed, and that basically goes to notice from the on the railroad company - to the railroad company but as far as - and what railroad company representatives were there at the meeting. But as far as allowing the video tapes in, that is just too much prejudice that would truly outweigh any probative value.

¶155. As stated in the trial judge's comments, she reviewed the video tapes and found them to be prejudicial to Illinois Central. However, she did allow testimony (to a certain degree) concerning certain events relevant to the meeting. There was no testimony given on the post-accident meeting, but the trial judge had the discretionary authority to allow the testimony to be presented to the jury. Therefore, the trial court did not err in allowing testimony regarding the meetings.

> **XX.    Did the trial court err by denying Illinois Central's Motion for Mistrial when Travis discussed a 1991 survey of Holmes County railroad crossings?**

¶156. During Travis' counsel's direct examination of Kenneth Robinson, Illinois Central's Risk Manager, Robinson was questioned regarding the condition of the Mileston crossing in 1991 and regarding a previous study from 1991 of Holmes County rail crossings. Illinois Central moved for a mistrial on the basis that the 1991 survey was not relevant to the 1997 Travis accident and that further mentioning the 1991 study would cause it to experience

97

substantial prejudice. The trial court did not admit the study into evidence. However, testimony was admissible to show Illinois Central's notice of the dangerous conditions which existed before Michael Travis' death. *See Young v. Ill. Cent. Gulf R.R.,* 618 F.2d 332 (5th Cir. 1980); *Ill. Cent. R.R. v. Williams*, 135 So.2d 831, 839 (Miss. 1961).

¶157. Specifically, on direct examination by Travis, Robinson was questioned about the study as follows:

Q:    And prior to that time, you had received notice from the people in the community and others that Mileston crossing was, in fact, not a safe crossing but a hazardous crossing for individuals in that community; isn't that correct?

A:    I'm sorry. I cannot answer that yes or no. I don't know that. Prior to 1994, I was not involved with Mileston. If it happened - I am not going to debate you on that; I just don't know about it.

Q:    Okay. So my initial question was, as early as 1991, you received such assertions for allegations that it was not a safe crossing a hazardous crossing; isn't that correct?

A:    Yes. May I explain?

Q:    Yes.

A:    I received the book in the mail. And if it is 1991, it's 1991. I am not going to debate the date. Dr. Gary Long is a college professor at the University of Florida. He had done a study for Pat Barret[t], and attorney across the  street here in Lexington, about the crossing in Holmes County.

I had just a very brief knowledge there was litigation going on as result of a crossing incident. It might have been at Mileston. And when I got the book, it came registered mail. And I simply gave it to our lawyers because there was litigation pending. Did I read it? No. What general

98

knowledge I had of the book, I think he had with every crossing in the county.

The testimony given by Robinson was not so overwhelmingly prejudicial or improper as to warrant a mistrial for Illinois Central. Robinson simply gave a very general and brief account of his knowledge of the 1991 survey. Based on the evidence in the record, the trial court did not abuse its discretion in denying Illinois Central's Motion for a Mistrial and allowing testimony regarding the 1991 survey of Holmes County crossings.

### XXI. Did the trial court err by denying Illinois Central's "for cause" jury strikes of the potential jurors?

¶158. The trial court has wide discretion in determining whether to excuse any prospective juror, including one challenged for cause. *Scott v. Ball,* 595 So. 2d 848, 849 (Miss. 1992). The judge also has an absolute duty to see that the jury selected to try a case is fair, impartial, and competent. *Id.* at 850. The trial court's decision to refuse to excuse a juror for cause will be reviewed and overturned only if the trial court abused its wide discretion. *Howell v. State,* 860 So. 2d 704, 727 (Miss. 2003); *Jackson v. State,* 791 So. 2d 830, 835 (Miss. 2001). "Voir dire 'is conducted under the supervision of the court, and a great deal must, of necessity, be left to its sound discretion.'" *Id.* (citing *Ballenger v. State,* 667 So. 2d 1242, 1250-51 (Miss. 1995)).

¶159. Illinois Central specifically mentions the trial court's denial of its challenge for cause to potential juror No. 30 (Ida Falls) who testified that she crossed the Mileston crossing two months prior to trial, and in 1997 on a sometime basis, resulting in Illinois Central exercising

99

peremptory challenge D-2. As stated previously, the trial court has wide discretion in voir dire matters. While in chambers for jury selection, the trial judge ruled as follows:

> Mr. Beckham: Let's see. You struck Melton already. The next one is Tommie Shaffer. He's kin to the Haymers, who had family members involved in an accident at this crossing in the 1990's, and know everybody out there in the neighborhood. He's been across the crossing in recent days or months.
>
> The Court: Cause is granted on Shaffer.
>
> Mr. Beckham: The next one is Juror Number 30, Ida Falls. Ms. Falls was across the crossing two months ago.
>
> The Court: Cause denied on Falls.

In this exchange, the trial judge granted cause as to one potential juror who was kin to individuals who were involved in an accident at the crossing in the 1990's. However, the trial judge denied a for cause jury strike against Ms. Falls. The trial judge had broad discretion to make this decision concerning Ms. Falls, and there was nothing that was so overwhelmingly prejudicial against Illinois Central as to warrant overturning the trial judge's ruling.

¶160.   Illinois Central also specifically mentions its for cause challenge of potential juror No. 91, Lillie Miles, who testified that she passed over the Mileston crossing one week prior to trial (this was the first time she had been over the crossing in more than 10 years) and every weekend in 1992. She was seated as Juror No. 10. Illinois Central argues that it is entitled to a new trial based on the decision by the trial court involving Ms. Miles. However, Travis was

correct when she asserted that Illinois Central lost the right to argue this point under ***Adkins v. Sanders,*** 871 So. 2d 732, 741 (Miss. 2004).

¶161.  In ***Adkins***, this Court stated as follows:

> It is well settled in this state that before an appellant may challenge a trial court's refusal to excuse a juror for cause, he must show that he used all of his peremptory challenges. The reason for this rule is that the appellant had the power to cure  substantially any error as long as he has remaining unused peremptory challenges. We would put the integrity of the trial process at risk were we to allow a litigant to refrain from using his peremptory challenges, and suffering an adverse verdict at trial, secure reversal on appeal on grounds that the Circuit Court did not do what the appellant wholly had power to do. ***Davis v. State,*** 660 So. 2d 1228, 1243-44 (Miss. 1995) (quoting ***Hansen v. State,*** 592 So. 2d 114, 129-30 (Miss. 1991).  This rule has been applied by this Court both where the appellant had not used all of his peremptory challenges at the time he was confronted with whether to accept the juror in question and also *where he chose to exercise a peremptory challenge on a juror whom he had not challenged for cause.*

871 So. 2d. at 741.  While Illinois Central did use all four of its peremptory challenges, it exercised two peremptory challenges on potential jurors who were not challenged for cause. Illinois Central had the opportunity to use the other two peremptory challenges on potential jurors who were also challenged for cause (such as Lillie Miles). However, it chose to use its remaining peremptory challenges on potential jurors not within the pool challenged for cause.  Since Illinois Central did not exercise its own power to remove Ms. Miles after the trial court used its broad discretion to deny cause, Illinois Central should not now be allowed to claim error.

**XXII. Did the trial court err by failing to dismiss for cause the potential jurors in the venire who admitted to taking medication which made them drowsy?**

¶162. Four of the jurors identified by Illinois Central were challenged because they stated that they took medicine that made them drowsy. As noted by the trial court, Juror No. 62 "stated she can work all day, she just gets sleepy when she gets home." Juror No. 69 stated that sometimes his headache medication makes him sleepy, but that he had not been sleepy that day. Jurors No. 83 and 92 stated they take sinus pills as needed, but that they could take a non-drowsy formula. These comments directly contradict Illinois Central's claims that the trial court granted challenges for cause on some jurors on this issue, but denied other such challenges on other jurors without making any distinction for doing so. Contrary to Illinois Central's argument, the trial court's ruling on these potential jurors did not deprive Illinois Central of the opportunity to empanel an attentive, competent jury. Therefore a new trial is not warranted.

**XXIII. Did the trial court err in denying Illinois Central's *Batson* challenges to Travis' peremptory jury strikes?**

¶163. In reviewing a trial court's decision on *Batson* challenges, this Court has stated:

> We give great deference to the trial court's findings of whether or not a peremptory challenge was race-neutral... Such deference is necessary because finding that a striking party engaged in discrimination is largely a factual finding and thus should be accorded appropriate deference on appeal... Indeed, we will not overrule a trial court on a Batson ruling unless the record indicates that the ruling was clearly erroneous or against the overwhelming weight of the evidence.

102

*Illinois Cent. R.R. Co. v. Hawkins,* 830 So.2d at 1177 (citing *Thorson v. State*, 721 So.2d 590, 593 (Miss. 1998)). "The term 'great deference' has been defined in the *Batson* context as meaning an insulation from appellate reversal of any trial findings which are not clearly erroneous." *Forrest v. State*, 876 So. 2d 400 (Miss. Ct. App. 2003).

¶164.  "The striking party is not required to 'provide the same degree of justification for a peremptory challenge as is required for a challenge for cause.'" *Burnett v. Fulton,* 854 So. 2d 1010, 1014 (Miss. 2003) (quoting *Bush v. State,* 585 So. 2d 1262, 1268 (Miss. 1991)). In *Barnett,* this Court stated that "inattentiveness, demeanor, sleeping during voir dire, lack of eye contact, educational level and hostility have all been held by this Court to be race neutral reasons in keeping with Batson." *Id.*; *Harper v. State,* 635 So. 2d 864, 868 (Miss. 1994); *Lockett v. State,* 517 So. 2d 1346, 1356-57 (Miss. 1987). The striking party is not required to supply "an explanation that is persuasive, or even plausible." *Hawkins,* 830 So.2d at 1177 (citing *Randall v. State,* 716 So. 2d 584, 588 (Miss. 1998)).

¶165.  Here, Travis exercised peremptory challenges on four jurors - a white male and three white females. Travis also accepted a white male juror while she had peremptory challenges remaining. Travis articulated the following explanations for the strikes: Juror Ware did not admit to owning a business despite repeated questions designed to elicit such information; he would not look at Travis's counsel, but was shaking his head and agreeing with Illinois Central's counsel; Juror Hill is a bank teller, and bank tellers have a tendency to not award large sums of money; Juror McCain works as an operations coordinator for a major utility

and her husband is in management with a large utility; both companies were involved in tort reform efforts at the time; and Juror Diggs owned and worked in a beauty salon where she was likely to hear "everything that goes on in the community."

¶166. Illinois Central did respond when the trial court asked for a response to each race-neutral reason, however, these responses did not cover the substance of the reasons articulated by Travis. The following exchange occurred when counsel for Illinois Central questioned Travis' peremptory challenge of Lenard Ray Ware:

> The Court: Defense have a response?
>
> Mr. Blackmon: Your Honor, on his questionnaire, he listed himself as an–
>
> Mr. Sweet: Air conditioner technician.
>
> Mr. Blackmon: Yeah, service technician. He lists his employer as Carrier or Courier, something like that.
>
> Mr. Sweet: That's he and his dad's business.
>
> Mr. Blackmon: He just says that he's a service technician.
>
> The Court: Court finds a race-neutral reason for number 15 and will accept Ware as P-1. P-2?

¶167. The conversation concerning Juror Hill evolved as follows:

> Mr. Sweet: Your Honor, we listed a witness, we were concerned about Pam Rucker. And this lady said she went to church with Ms. Rucker. Her husband is, is into logging, and is a mechanic involved in logging. We made the determination that a person who is in that area, we did not, logging, that concerned us. There was really another reason is in my experience on plaintiffs' cases, she's a bank teller, Your Honor, and bank tellers have a tendency not to want to award large sums of money. And I don't have on my

104

juries, if I can help it, have bank tellers, bank officials on my juries, and bank tellers are very cheap with money.

The Court: Response?

Mr. Blackmon: Your Honor, this lady is Ms. Hill makes a reference with Pam Rucker. That's the plaintiffs's witness, Your Honor. That's the lady who Mr. Travis was working with at the time that he was killed. So that's their, presumptively, that's their kind of juror, you know, who's going to be, have some relationship with one of their witnesses that are going to testify for and on behalf of Mr. Travis.

The Court: Court finds a race-neutral reason for plaintiffs Number 42, Self, and will accept her as Plaintiffs P-2. P-3, McCain?

¶168. The exchange concerning Jackie McCain was as follows:

Mr. Sweet: Jackie McCain, Your Honor, she was, we have a, you have utilities and railroad companies. She is an operations coordinator for Entergy, which is a major utility, and 's in management with a major utility and just so, in which people there tend to be clearly pro-business. That company is involved in all this anti-tort reform stuff, and just in case her profession doesn't do it, her husband is a manager with BellSouth, which is another company involved in all of this. And so, Your Honor, I think that no one would expect the plaintiffs to want people on a railroad case, who, themselves, are in management or employed by utilities.

The Court: Response?

Mr. Blackmon: Your Honor, it says on the questionnaire, and she wrote, and nobody went into it, she's an operations coordinator at Entergy. It doesn't say she has any supervisory responsibility, makes any management decisions.
The Court: Court finds a race-neutral reason for plaintiffs peremptory strike P-3, will accept McCain as plaintiffs P-3. P-4, Diggs?

¶169. Finally, the record reflects the following conversation as it pertains to Juror Diggs:

Mr. Sweet: Your Honor, I specifically asked to elicit testimony. She is a hairstylist who owns her own business. And she's independent, owns her own business and a hair stylist and they hear and talk with everything that goes on

in the community, everything that goes on in politics, and hears everybody's views, and we prefer not to have an owner, a business person who has those people throughout the community in their business on a regular basis.

The Court: Response?

Mr. Blackmon: And I don't know , he said because she hears from folks from around the community. It was nothing asked of her during the voir dire that a hair stylist, such as she, actually heard about or inquired about anybody else's business.

Mr. Sweet: Your Honor, her father was hit by a drunk driver and filed no claim. And people tend to say, have accidents and not file claims tend not to believe in other people who file claims. I can't imagine how anybody being hit by a drunk driver - -

The Court: Well, you were doing better before you got into that. (LAUGHTER) The Court finds a race-neutral reason for Diggs, and accepts her as P-4. Panel is tendered to the defense.

Furthermore, as stated in the record, Travis' race-neutral reasons were accepted by the trial court and the record did not show the trial court was clearly erroneous or that the trial court's ruling was against the overwhelming weight of the evidence.

**XXIV.**      **Did the trial court err by allowing Travis to include in the record as an offer of proof the letter dated December 3, 1990 from Zeinz to Clark.**

¶170.  At trial, Travis made an offer of proof of Exhibit P-166, a letter dated December 3, 1990, from Thomas Zeinz to Joe Clark. Illinois Central objected on the basis that the trial court precluded this letter pursuant to 23 U.S.C. § 409. However, the trial judge allowed the letter to be made an exhibit as an offer of proof.

¶171. Illinois Central specifically states that the trial court erred by allowing Travis to include in the record as an offer of proof the letter dated December 3, 1990, from Zeinz to Clark. In her cross-appeal, Travis argues that the letter should have been admitted into evidence because (a) it establishes that Illinois Central recognized ten years before Michael Travis's accident that it was not complying with the recognized safety requirements in the industry; and (b) doing the right thing was not that expensive. The primary reason for an offer of proof is to get the proposed answer and expected proof in the record for the benefit of the appellate court, so that the appellate court may know what evidence is being excluded by the trial court. ***Nalls v. State,*** 651 So. 2d 1074 (Miss. 1995) (citing ***Brown v. State,*** 338 So. 2d 1008 (Miss. 1976). By submitting the letter as an offer of proof, Travis' purpose was simply to afford this Court an opportunity to review the excluded evidence.

¶172. Furthermore, Illinois Central's assertions tend to support why the letter should not be admitted as *evidence* more than providing solid reasoning to prohibit the letter from being submitted as an *offer of proof*. This is a very fine distinction which Illinois Central fails to recognize and address when it framed its argument. In ***Freeman v. State,*** 204 So. 2d 842 (Miss. 1967), Chief Justice Ethridge stated in his dissent:

> Where an objection has been sustained to a question, an offer of proof is appropriate. The rejection of the evidence not apparently admissible is not error, in the absence of an offer or sufficient statement of the purpose of its introduction, by which the court may determine its relevancy or admissibility. Accordingly, it is proper for the trial court to overrule an offer of proof where the language of the offer is general, vague, and not sufficiently specific. An

offer should clearly inform the court as to what is intended to be proved, and the language should be as such as to enable the court to determine whether the evidence sought to be offered is admissible.

*Id.* at 847-48 (Ethridge, C.J., dissenting).

¶173. Illinois Central did not allege that it was improper to admit the letter as an offer of proof because the offer was general, vague, and not sufficiently specific, but that 23 U.S.C. § 409 precluded its use. However, based on the information submitted by Travis to the trial court, the offer of proof was sufficiently specific for it to be accepted by the trial court for review by this Court. Therefore, it was not erroneous for the trial court to accept the letter as an offer of proof.

> **XXV. Was the jury's assessment of fault and the amount of damages awarded by the jury against the overwhelming weight of the evidence?**

¶174. Illinois Central contends that the jury's assessment of only 25% fault to Michael Travis is contrary to the weight of the evidence. Illinois Central also asserts that the $5,000,000.00 verdict for one death is also against the overwhelming weight of the evidence and is grossly excessive. Furthermore, Illinois Central characterizes the jury's assessment of fault and the amount of damages as biased and prejudicial.

¶175. It is the function of the jury to apportion causative negligence on conflicting evidence. *Golden Flake Snack Foods, Inc. v. Thornton,* 548 So. 2d 382, 384 (Miss. 1989). The jury in this case heard the testimony and examined the evidence as given. Based on what was

presented before it, the jury made the decision that Michael Travis was 25% at fault and that Illinois Central was 75% at fault.

¶176. Furthermore, it cannot be said that the jury's award was outrageous or unreasonable. The standard of review in determining whether a jury verdict is excessive is whether the damages are so excessive as to strike mankind, at first blush, as being beyond all measure, unreasonable, and outrageous, and such as manifestly show the jury to have been actuated by passion, partiality, prejudice, or corruption. However, this Court has held that a jury verdict cannot be disturbed simply because the amount of damages seems "too high" or "too low." *Ill. Cent. R.R. v. Hawkins,* 830 So.2d at1181. In reviewing a jury verdict, the Court will resolve all conflicts of evidence in the appellee's favor and determines all reasonable inferences from the testimony in the light most favorable to the appellee's position. *Thompson Mach. Commerce Corp. v. Wallace,* 687 So.2d 149 (Miss. 1997).

¶177. Some of the evidence before the jury included: Michael Travis was 33 years old when the accident occurred. He sustained internal injuries, including contusions, fractures, bleeding from the aorta, and hemorrhaging. Testimony by Dr. Stephen Hayne, an expert in forensic pathology, established that the underlying cause of Michael's death was traumatic injuries, including lacerations and tears of the lung and internal bleeding of approximately three and three-quarters quarts.

¶178. The evidence also established that Michael Travis was conscious at the scene of the accident and begging bystanders to help him. Annie Sago testified that she saw Michael

109

Travis crawling on the ground, bleeding from the head, and crying out, "Help me!" Michael Travis was employed by Alcorn State University, and it was established that the net present value of his lifetime earnings approached $500,000.

¶179. In this case, the jury awarded $5,000,000, but this figure was reduced to $3,750,000. Based upon the given testimony, the $3,750,000 award was not outrageous, excessive or "ludicrous" as suggested by Illinois Central.

### XXVI. Did the trial court err in denying Illinois Central's Motions for Change of Venue?

¶180. On July 9, 2003, Illinois Central filed its Motion for Change of Venue. By Order dated September 22, 2003, the trial court denied Illinois Central's Motion for Summary Judgment and Motion for Change of Venue. At trial, following voir dire, Illinois Central renewed its Motion for Change of Venue. The trial court once again denied the Motion for Change of Venue. Illinois Central asserts that it is entitled to a change of venue outside of Holmes County because there was citizen bias and pretrial publicity which caused it to experience substantial prejudice.

¶181. A Motion for Change of Venue is addressed to the discretion of the trial judge, and the ruling will not be disturbed on appeal unless there has been abuse of discretion by the trial judge, or the trial judge's discretion has not been justly and properly exercised under the circumstances of the case. *Beech v. Leaf River Forest Prods., Inc.,* 691 So. 2d 446, 449 (Miss. 1997). However, this Court may reverse the trial court's ruling upon the showing that

110

the judge's discretion was so abused as to be prejudicial to a party. *Shearer v. State,* 423 So. 2d 824, 826 (Miss. 1982).

¶182. Miss. Code Ann. § 11-11-51 provides that venue should be transferred only when "prejudice exist[s] in the public mind, or for some other sufficient cause [that a party] cannot obtain a fair and impartial trial in the county where the action is pending...." The defendant is entitled to be tried in a county where a fair proportion of the people qualified for jury service may be used as a venire from which a jury may be secured to try his case fairly and impartially..." *King v. Kelly,* 243 Miss. 160, 137 So.2d 808, 813 (1962).

¶183. Illinois Central presented two newspaper articles and a letter to the editor, all appearing in the weekly *Holmes County Herald* as evidence of pre-trial publicity. The evidence established that the *Holmes County Herald* has a circulation of less than 4,000. The first article and the letter to the editor appeared six years and four months before the Travis trial started; the second article appeared three years before the trial started. Illinois Central stated that the 1997 article detailed facts and circumstances surrounding Michael's accident. The details provided were as follows: "Mr. Travis died from injuries sustained following a truck/train collision at the Mileston crossing." Illinois Central also stated that the 2000 article gave a detailed prior accident history. This detailed prior accident history read as follows: "there had been at least two other fatal accidents at this crossing, one in 1991 and the other in 1997." Illinois Central further claims that the citizen bias was confirmed during voir dire.

111

Fifteen of the veniremen drove across the tracks at the Mileston crossing at some time; only one had used the crossing near the time of Michael's accident.

¶184. This Court upheld a denial of a change of venue under Section 11-11-51 in ***Maxwell v. Ill. Cent. Gulf R.R.,*** 513 So. 2d 901 (Miss. 1987). The record in the ***Maxwell*** case demonstrated that a majority of the 31 veniremen personally knew plaintiffs, three were related to plaintiffs, and two were connected to plaintiffs' attorney. ***Id.*** at 908. Nevertheless, this Court concluded that it was not an abuse of the trial court's discretion to deny a transfer pursuant to Section 11-11-51.[9]

¶185. Finally, during voir dire, the trial court inquired as to the juror's ability to make fair and impartial decisions. Specifically, the trial court instructed the jurors before either side presented their case as follows:

> Anything you have read in the newspaper, heard on the news, heard in the streets, you can't consider that as evidence because it is not evidence. And your decision must be based on the evidence that comes from the witness on the stand. Okay? So you all understand that you can't make a decision based on anything that doesn't come from the witness stand? Do we understand that?
>
> The jury replied, "Yes."

¶186. Therefore, based upon the evidence, the trial court did not abuse its discretion in denying Illinois Central's Motion for Change of Venue.

---

[9]*See also **Harris v. State***, 537 So. 2d 1325 (Miss. 1989) (denial of criminal defendants' request for change of venue upheld where nineteen newspaper articles (including *The Clarion Ledger* and *The Commercial Appeal*) publicized the crime and there was full television coverage of the preliminary hearings).

**XXVII. Did the trial court err in excluding portions of the Federal Court Record from the Record in this cause?**

¶187. On May 25, 2003, the trial court entered an Order precluding Illinois Central from designating for the Record on appeal the prior federal court proceedings in this case. Illinois Central contends that nearly all of the course of discovery in this case took place in the United States District Court for the Southern District of Mississippi, over the course of four years.

¶188. However, Illinois Central fails to mention that the proceedings of the federal district court were vacated by the Fifth Circuit Court of Appeals and remanded back to the Circuit Court of Holmes County, Mississippi. The Fifth Circuit found that the federal district court did not have subject matter jurisdiction over the case. *See Travis v. Irby,* 326 F.3d 644 (5th Cir. 2003); *Stockman v. Fed. Election Comm'n,* 138 F.3d 144, 151 (5th Cir. 1998); *B., Inc. v. Miller Brewing Co.,* 663 F.2d 545, 554 (5th Cir. 1981). Furthermore, Illinois Central does not cite in its brief any authority to support this argument, and this Court need not address it.

## CROSS-APPEAL OF TRAVIS

I. **Did the trial court err when it denied Travis' Motion for a punitive damages hearing?**

A. **The Standard of Appellate Review.**

¶189. An abuse of discretion standard is implemented when this Court reviews the trial court's decision of whether a case warrants punitive damages to be sent to the trier of fact.

***Gamble v. Dollar Gen. Corp.,*** 852 So.2d 5, 15 (Miss. 2003). The failure of the trial court to apply the correct legal standard is an abuse of discretion. ***Bell v. City of Bay St. Louis,*** 467 So. 2d 657, 661 (Miss. 1985). When the abuse of discretion standard applies, the appellate courts may also reverse when a trial court's ruling is "arbitrary and clearly erroneous." ***Weiss v. Louisville, N.O. & T. Ry.,*** 7 So. 390 (Miss. 1890). Travis contends that the ruling of the trial court denying her motion for a punitive damages hearing should be reversed on both grounds.

### B. Did the trial court fail to apply the correct legal standard?

¶190. After the jury returned its compensatory award, Travis requested a punitive damages hearing. The trial court denied the request, ruling as follows:

> This Court under ***Hawkins v. Illinois Central Railroad Company,*** [830 So. 2d 1162 (Miss. 2002)], as well as ***Illinois Central Railroad Company v. White***, [610 So. 2d 308, 320 (Miss. 1992)], finds that the actions of the Illinois Central Railroad Company amounts to that of ordinary negligence and that of gross negligence, and there has been no evidence of any aggression on the part of Illinois Central. Therefore, the issue of punitive damages will not be submitted to the jury.

¶191. Mississippi's punitive damages statute, Miss. Code § 11-1-65(a), establishes the proper standard of care:

> Punitive damages may not be awarded if the claimant does not prove by clear and convincing evidence that the defendant against whom punitive damages are sought acted with actual malice, gross negligence which evidences a willful, wanton, or reckless disregard for the safety of others, or committed actual fraud.

¶192. In ***Hawkins,*** this Court stated:

114

This Court has repeatedly held that "[i]n order to recover punitive damages under Mississippi law, there must be some element of aggression or some coloring of insult reflecting malice, gross negligence, or ruthless disregard for the rights of others."

*Illinois Cent. R.R. v. Hawkins,* 830 So.2d at 1172*, quoting Illinois Cent. R.R. v. White,* 610 So.2d 308, 320 (Miss. 1992).

¶193. Travis contends that the trial court limited its legal inquiry simply to the first criterion - "some element of aggression"- and that it failed to take into account the second criterion - "some coloring of insult reflecting... gross negligence, or ruthless disregard for the rights of others." Therefore, the trial court did not abuse its discretion when it declined to submit the issue of punitive damages to the jury. The trial court found that the actions of Illinois Central amounted to that of ordinary negligence and not that of gross negligence. Furthermore, the trial judge did not fail to apply the correct legal standard because she applied the standard of Miss. Code Ann. § 11-1-65(a); and therefore, her decision was not erroneous.

### C.    Was the trial court's ruling arbitrary and clearly erroneous?

¶194. When determining whether to proceed with a hearing on punitive damages, the trial court must look to the totality of the circumstances to determine if a reasonable, hypothetical trier of fact could find either malice or gross neglect/reckless disregard. *Gamble v. Dollar General Corp.,* 852 So. 2d at 15. While simple negligence is not enough to support a hearing on punitive damages, "accompanying facts and circumstances may be used to show that the portion of defendant's conduct which constituted the proximate cause of the accident was

115

willful and wanton or grossly negligent." ***Choctaw Maid Farms, Inc. v. Hailey,*** 822 So. 2d 911, 924 (Miss. 2002).

¶195. As stated in the previous section, the trial judge found that Illinois Central's conduct and actions amounted to that of ordinary negligence. Therefore, her ruling was not arbitrary and erroneous.

¶196. In her cross-appeal, Travis also argues that the letter dated December 3, 1990 from Zeinz to Clark is relevant to punitive damages because (a) it establishes that Illinois Central recognized ten years before Michael Travis's accident that it was not complying with the recognized safety requirements in the industry; and (b) doing the right thing was not that expensive. The letter provides in pertinent part:

> So why our decision to recommend gates? Prior to 1987, the IC generally still held to a former industry-wide notion that gates should not be included on projects at single track crossings. Some time in the late 1970's or early 1980's, though, that notion was pretty much discarded by most of the rest of the industry and many State & FHWA engineers. In early 1987, we recognized this long held position was not in step with current FHWA guidelines as promulgated in the FHPM, the Grade Crossing Safety Handbook and the MUTCD, and as such, was causing us no small amount of problems in crossing litigation. High speed trains, passenger trains, school buses, hazardous materials vehicles and restricted clearing sight distances are all factors which are included in the aforesaid publications as reasons to consider gates, even in single track territory.
>
> Although the operation of high speed trains alone may not in itself be sufficient enough reason to warrant gates, we also recognized school buses, haz-mat vehicles, and/or restricted sight distances (owing to adjacent buildings, cars on side tracks, seasonal vegetation, etc) are also factors to some degree at virtually every such crossing. Also, contrary to 20 years ago, the additional cost of adding gates on a  new installation is not that expensive. Accordingly, we decided that from then on we would not only acquiesce to

116

but, in fact, recommend gates be included in all new signal installations, or significant upgrades, wherever passenger trains operate on our lines in excess of 60 mph.

¶197. However, Illinois Central argues that 23 U.S.C. § 409 precludes the use of this letter for any purpose and provides in relevant part:

> Notwithstanding any other provision of law, reports, surveys, schedules, lists or data compiled or collected for the purpose of identifying, evaluating, or planning the safety enhancement of potential accident sites, hazardous roadways, or railroad-highway crossings, pursuant to §§ 130, 144, and 152 of this title or for the purpose of developing any highway safety construction improvement project which may be implemented using federal-aid highway funds shall not be subject to discovery or admitted into evidence in a Federal or State Court proceeding for any other purposes in any action before damages arising from any occurrence at a location mentioned or addressed in such reports, surveys, schedules, lists, or data.

¶198. Illinois Central contends that this Court has specifically held that 23 U.S.C. § 409 precludes the admission of letters recommending flashers, crossing hazard rank inventories, and testimony based thereon. *Sawyer v. Illinois Cent. Gulf R.R.,* 606 So.2d 1069, 1074 (Miss. 1992). However, since this Court's decision in *Sawyer*, the statute has been amended, including specifically the section which Illinois Central relied upon to exclude the letter. In amending the statute, Congress intended that the amendment reflect that "the raw data collected prior to being made part of any formal or bound report shall not be subject to discovery or admitted into evidence" in court proceedings. H. Rep. No. 104 - 246 at 59 (1995).

¶199. Additionally, the United States Supreme Court placed significant limits on the interpretation of Section 409 in 2003, after this Court issued its opinion in *Sawyer*. *See*

117

*Pierce County v. Guillen,* 537 U.S. 129, 123 S.Ct. 720, 154 L.Ed. 2d 610 (2003); *see also*

*Tel. Publ'g Co. v. Kan. Dep't of Transp.,* 69 P.3d 578 (Kan. 2003) (narrowing the range of

documents protected under Section 409). In *Guillen*, the U.S. Supreme Court limited the

scope of Section 409 by finding that the statute "protects all reports, surveys, schedules, lists,

or data actually compiled or collected for" a purpose listed in Section 409, but "does not

protect information that was originally compiled or collected for purposes unrelated to" the

statutory objective "and that is currently held by agencies that compiled or collected it, even

if the information was at some point 'collected' by another agency for" a statutory objective.

*Guillen*, 537 U.S. at 144.

¶200. Based on this analysis of the statute, the letter is not a document covered by Section

409. It is not a report, a schedule, a list, or data compiled or collected for the Mileston

crossing. The letter was not written for the purpose of identifying, evaluating, or planning

the safety enhancement of the Mileston crossing. The letter was not written in anticipation

of or prior to any formal bound report or any crossing. The letter was simply a request from

Illinois Central Railroad to the Mississippi State Highway Department (now MDOT) seeking

reimbursement for gates that Illinois Central installed at a crossing in Batesville, Mississippi.

Even though the trial court did err in not allowing Travis to introduce this letter into evidence

because the letter was not a document covered by Section 409, the exclusion only amounted

to harmless error.

¶201. It is abundantly clear that the rulings of the trial judge were fair, impartial, and correct. They did not constitute an abuse of judicial discretion and should be affirmed. The majority agrees that the verdict of the jury was not against the overwhelming weight of the evidence. Hence, I would affirm the trial court's judgment on both direct appeal and cross-appeal. A new trial is not warranted, and I respectfully dissent from the majority's decision to reverse and remand this case for a new trial.

**DIAZ, J., JOINS THIS OPINION. RANDOLPH, J., JOINS THIS OPINION IN PART.**